OPINION OF THE COURT
Lorraine S. Miller, J.
“Oh, what a tangled web we weave, when first we practice to deceive,”[1] appropriately describes the conduct of the plaintiff who seeks a declaratory judgment herein, pursuant to CPLR 3001, to declare a lease null and void, and to enjoin defendant from instituting any proceedings to recover possession of commercial premises. Defendant initially asserted three counterclaims: (1) treble damages under the RPAPL for $1,500,000 for wrongful eviction; (2) extension of the lease for the period during which it remained dispossessed; and (3) restoration to the premises. (The second and third counterclaims have been discontinued.) The case appears to be one of first impression in the application of treble damages to an “unlawful lockout” from commercial premises. The testimony before this court *435 for five days furnished by 13 witnesses, participation by 6 attorneys, 46 exhibits and prior hearings before Mr. Justice Joseph Kunzeman on June 11, 1980 and June 17, 1980 and two Civil Court summary proceedings is summarized as follows:
Samuel Hassine, the principal stockholder and an officer of the plaintiff, Sam & Mary Housing Corp., is an experienced realtor and sophisticated businessman with substantial interests in three States. (The only other officer of the plaintiff corporation is Mary Ann Masone, a close friend of Mr. Hassine, who acts as secretary thereof.) In or about June, 1979, Hassine entered into contract negotiations for the purchase of a building at 105-34 Rockaway Boulevard, Queens, owned by Abraham Eagle. The premises contained a 2,000 square foot street-floor food store and a 1,000 square foot basement (once also operated by Eagle who had previously sold the business and had given a low-rent lease as an inducement to buy to a prior store purchaser, Shoman Bros. Corp.). At the time of the building negotiations between Hassine and Eagle in June, 1979, the food market was owned and operated by a successor purchaser, Giovanni Scalera, doing business as 105-34 Rockaway Corp. which had assumed the lease from Shoman Bros.
Hassine testified that prior to going to contract on the building in July of 1979, he had tried to determine the nature of the store’s occupancy by speaking with Scalera, who had allegedly advised him that the tenancy was month to month, that the store was unprofitable and he intended to vacate. Scalera denied any such conversation and asserted, to the contrary, that he had acquired, by assignment, a 10-year, low-rent lease from the prior store operator, Shoman Bros., which had until March 22,1988 to run, and that said lease provided, in part: “This lease may be assigned without the landlord’s consent provided the assignee and their successors in interest assume the terms and conditions thereof without releasing the tenant or its successors in interest from liability thereunder”.
On July 3, 1979, Hassine ánd his attorney, Howard Stein, met with the owner of the building, Abraham Eagle, at the office of Jacob Lebwohl, Esq., attorney for Eagle. All *436 attendees testified that lengthy discussions took place and it appears that two contract copies were currently processed by the two attorneys, Stein and Lebwohl, during the course of the negotiations that day. Paragraph 6d of the contract provided “Said premises are sold and are to be conveyed subject to * * * existing leases and tenancies”. Paragraph 4 of the rider to the contract states in pertinent part:
“4. Seller represents that the following are his tenants:
_NAME_ LEASE EXPIRATION AMOUNT OF RENT
105-34 Rockaway Blvd. Corp. 3/22/88 as per lease
“Purchaser has seen a copy of lease.”
Hassine testified that he signed the contract, but does not recall reading paragraph 6d and that he did not see a lease at that time. Stein, Hassine’s former lawyer and a real estate specialist, testified that Hassine did, in fact, see the lease at the July, 1979 contract signing; that he specifically took his former client to an adjoining room and advised him not to buy the building since the unfavorable lease terms made it a “lousy” deal; that Hassine decided to proceed notwithstanding his advice and said he would “handle the lease in his own way.” The Lebwohl and Eagle testimony corroborated that discussions were held about lease provisions on that occasion, including the low rent, usage and.payment of water charges, etc. On August 17, 1979, Hassine proceeded to close title to the building but documents of both parties were held in escrow by their respective attorneys, Lebwohl and Stein, to permit Hassine to complete certain physical inspections if he so desired. A closing statement was given Hassine, however, which gave him a credit of $1,000 for rent security on deposit for the store.
In September, 1979, one Salvatore Vinti contacted Has-sine and advised him that he intended to purchase Seal-era’s food market and assume Scalera’s lease but Vinti asked for a longer lease with a view towards renovating the store. When Hassine sought to cut off use of a part of the basement and effect other changes in the lease, the discussions became polarized and Hassine advised Vinti that he had no knowledge of Scalera’s alleged lease and *437 would not recognize the same. Scalera testified that he, too, exhibited the lease to Hassine during such discussions.
Subsequent to this encounter between Hassine and Vinti, Hassine directed his attorney, Stein, to obtain the closing documents which Lebwohl was still holding in escrow and to advise Scalera not to sell the store since he, Hassine, did not recognize the underlying lease. Stein complied with- Hassine’s request, but testified that he, thereafter, ceased representing Hassine because of their disagreement about the existence of the lease that he, Stein, knew to be valid.
In late 1979, Howard Stein was replaced by David Lee Foster, Esq., from Geneva, New York, a friend of Hassine’s son, who wrote to Scalera’s attorney, Diego Stincone, Esq., on November 16, 1979, that Hassine did not consider the lease binding as same was unrecorded. A copy of the Stein-Stincone letter was sent to Vincent Bucemi, Esq., attorney for the potential store purchaser, Vinti (and his corporation, Jo/Sal Market Corp., defendant herein). Foster also commenced nonpayment proceedings against Scalera which were settled, significantly, by Hassine accepting the-$100 per month rent increase provided for and in accordance with the terms of the allegedly nonexistent lease![2] Foster then tried once more, unsuccessfully, to negotiate a new and more favorable lease for Hassine with Vinti. A barrage of letters were exchanged thereafter, all pertaining to Hassine’s disavowal of the lease.
On April 17, 1980, defendant Jo/Sal Market Corp. (Vinti’s corporation) assumed the lease from Scalera’s corporation. On April 22,1980, Hassine, on advice of his attorney, chained and padlocked the store. When Vinti allegedly broke the lock and entered, Hassine summoned the police and “chased” him out of the store. He and the defendant corporation have been out of possession since that time.
Shortly thereafter, Hassine rerented the store to one Harry McDonagh, with whom Hassine testified he had no connection except as a neighborhood bar owner at the *438 adjacent 105-40 Rockaway Boulevard. The lease between them was duly recorded by Hassine, not the tenant. Several months later, McDonagh assigned this new lease to the current occupants, Gregory Masone and Thomas Barcia. (It is significant in the context of this case that Gregory Masone “a very close friend” of Hassine’s,[3] is also the son of Mary Ann Masone, Hassine’s associate and secretary of the plaintiff corporation.) The court also takes judicial notice[4] of the case of Herald Midtown Vending Corp. v McDonagh (Civil Ct, Kings County, index No. 67869/82), which had been, coincidentally, before me in February, 1983 on a motion in which it was stated that Harry McDonagh and Mary Ann Masone (a principal of the plaintiff herein) were partners in the aforesaid “neighborhood” bar and that Hassine’s son, Eli Hassine, was their attorney — thereby belying Hassine’s sworn testimony that his lease to McDonagh for the premises herein and subsequent assignment of same to Masone were “arms length transactions.” (When this court brought the existence of this contradiction to the attention of both sides in May, 1983 and suggested that an explanation of the discrepancy in Mr. Hassine’s sworn testimony might be in order, none was forthcoming.)
Hassine contends that: (i) he is a bona fide purchaser for value under section 291 of the Real Property Law and the unrecorded lease is void as against him; (ii) defendant Jo/Sal has “unclean hands” and is estopped from asserting counterclaims because Vinti assumed Scalera’s lease with full knowledge that by doing so he was “buying a lawsuit,” as Hassine did not intend to honor the lease; (iii) defendant Jo/Sal has failed to prove actual damages with reasonable certainty; (iv) defendant has failed to establish treble damages under RPAPL 853 as no force, or threat thereof, was used in executing the eviction.
Defendant contends that it has pleaded and proved its counterclaim for wrongful eviction and is entitled to treble damages computed on the basis of: $28,000 compensatory damages (purchase price $16,000, inventory $9,500 and *439 legal services $2,500, expended when purchasing Scalera’s grocery store), $89,640 representing present discounted value of the future loss of profits, $28,399 representing the present discounted value for future loss of the leasehold, $21,600 representing the prior three years of the lease from April, 1980, through April, 1983 at $600 per month, and $54,000 representing the prior three years’ loss of profits at $18,000 per annum (testified to by Scalera as actual funds paid to the two principals from store income). Defendant further contends that the total of $221,639 should be trebled to $664,917.
Pursuant to CPLR 4213, the court makes the following findings which it deems established by the testimony, observation of the witnesses and a careful review of the 46 exhibits and court proceedings heretofore had herein: that a valid lease existed, that plaintiff’s principal had actual knowledge of the terms thereof and said knowledge was chargeable to the plaintiff corporation as well. (Said finding is fully consistent with the decision of Mr. Justice Kunzeman, Aug. 15, 1980.)
The sworn testimony of plaintiff’s former lawyer, Howard Stein, and persons present at the contract signing and closing, as well as documents executed thereat, give full support to the court’s conclusion that plaintiff knowingly purchased the building subject to an outstanding store lease. The testimony of Hassine, generally, was unworthy of belief, and the court concluded that he was determined from the outset to abrogate an unfavorable lease, finally employing “self-help”, which a civilized society deplores.
Having determined that Hassine had actual knowledge of the lease’s existence, the court further finds that plaintiff’s contentions of being a bona fide purchaser for value, who took the premises free of the unrecorded lease under section 291 of the Real Property Law is equally without merit. That section provides in relevant part: “A conveyance of real property * * * may be recorded in the office of the clerk of the county where such real property is situated * * * Every such conveyance not so recorded is void as against any person who subsequently purchases or acquires by exchange or contracts to purchase * * * the same real property or any portion thereof * * * in good faith and *440 for a valuable consideration, from the same vendor * * * and whose conveyance, contract or assignment is first duly recorded”. (Emphasis added.)
While a lease in excess of three years is a “conveyance of real property” within the meaning of the quoted section, neither the statute nor the authorities interpreting same require recording. (Real Property Law, § 290; 33 NY Jur, Landlord and Tenant, § 36, p 328.) Further, once actual notice of a conveyance exists, as it does in the instant case, the failure of a lessee to record loses all pertinence since the purpose of recording acts is to furnish constructive notice. (Reed v Barkley, 123 Misc 635.) Where a grantee of a building prior to his purchase thereof had actual knowledge of a prior unrecorded lease for a term exceeding three years and of a tenant’s possession thereunder, he cannot pose as a purchaser in good faith and cannot rely on tenant’s failure to record same as justification for refusing to recognize the lease. (Herubin v Malackowski, 113 Misc 100; see, also, Xar Corp. v Di Donato, 76 AD2d 972; Pallone v New York Tel. Co., 34 AD2d 1091, affd 30 NY2d 865; 1 Rasch, NY Landlord & Tenant, Summary Proceedings, § 10, pp 12-13.) The court, therefore, finds that the recording act, supra, does not benefit plaintiff herein, and plaintiff’s contentions to the contrary are without merit.
Equally without merit are plaintiff’s contentions that defendant’s counterclaims are barred by the doctrine of “unclean hands”, and that Scalera voluntarily surrendered the store to Hassine. Defendant’s assertion of its legally enforceable right to assume Scalera’s lease, even in view of possible future litigation, was not illegal, in bad faith or with intent to injure plaintiff. Defendant was under no obligation, legal or moral, to accept Hassine’s obstinate, summary denial of the existence and legal efficacy of the lease.
With respect to Scalera’s alleged surrender of the premises to Hassine, which „ Scalera vehemently denied, the burden of proving a surrender rests upon the party seeking to establish it or relying upon such surrender. (34 NY Jur, Landlord and Tenant, § 388, p 232.) The court finds that plaintiff has failed to meet this burden. Hassine testified that Scalera gave him the key to the store in April, 1980. *441 Ironically, but significantly, Hassine’s successor attorney, Foster, testified that he was never told of any such surrender by his client. In any event, mere surrender of keys would accomplish nothing as a matter of law; while key delivery would be some evidence of an intent to surrender, the weight of such an act would vary with the circumstances in each case. (See Matter of Barnes, 37 Misc 2d 833; Dagett v Champney, 122 App Div 254; 2 Rasch, NY Landlord & Tenant, Summary Proceedings, § 869, p 315; 34 NY Jur, Landlord and Tenant, § 397, p 246.)
The court finds that surrender of the premises to Hassine was never intended and never occurred. Scalera had already assigned his lease to Vinti, the defendant, and had previously accepted $16,000 from him as well as a written obligation of $9,500 for the inventory. Further, the credible testimony indicated that when Vinti entered to operate the store, Scalera was with him, having agreed to help him physically and by lending his beer license during the initial days of operation. (Finally, it would have been against Scalera’s financial interests to surrender the store premises for Scalera would probably never be paid money still due him from the sale of the business unless Vinti could derive revenue therefrom.)
The court now directs its attention to defendant’s counterclaim under the recently amended RPAPL 853, which provides: “If a person is disseized, ejected, or put out of real property in a forcible or unlawful manner, or, after he has been put out, is held and kept out by force or by putting him in fear of personal violence or by unlawful means, he is entitled to recover treble damages in an action therefor against the wrong-doer.” (Emphasized verbiage indicates amdt added by L 1981, ch 467, § 2.)
The foregoing statute prior to 1981 amendment was applied to both commercial and residential evictions, but the use of unusual force or threat thereof was declared to be an essential element by the Court of Appeals. (Randall-Smith, Inc. v 43rd St. Estates Corp., 17 NY2d 99; Drink-house v Parka Corp., 3 NY2d 82; Statement, Inc. v Pilgrim’s Landing, 49 AD2d 28; Chapman v Johnson, 39 AD2d 629; Pisano v County of Nassau, 41 Misc 2d 844, affd 21 AD2d 754; Brandt v De Kosenko, 57 Misc 2d 574; *442 Launikitis v Garcia, 18 Misc 2d 409.) Thus before legislative action in 1981, changing a lock on a tenant’s door was insufficient to bring it within the treble damage provision. (Drinkhouse v Parka Corp., supra.) The lengthy posttrial memorandum submitted by plaintiff’s counsel strangely quoted RPAPL prior to its 1981 amendment without any indication that the law had been changed. The said plaintiff’s memorandum also mistakenly argues law applicable to a breach of contract rather than the law applicable to the commission of tortious acts.
The Legislature, in enacting this amendment in 1981, manifested an intent to provide broader and expanded coverage to allow recovery in cases where no force or threat thereof is employed but a lock-out or other wrongful eviction takes place. (See Carter v Andriani, 84 AD2d 513 [Kupferman, J. P., dissenting opn].) This intent is spelled out in Assemblyman Richard N. Gottfried’s memorandum in support of the bill which states in part: “The harm, suffering, and financial loss involved in these illegal evictions is often substantial. Present procedural remedies only apply where the illegal eviction was carried out by ‘force’. However, these evictions are usually carried out by removing the tenant’s possessions while he or she is out, or by plugging or changing the door lock — actions beyond the narrow legal definition of force. This bill would correct the unduly narrow scope of the remedy to cover the full wrong.” (NY Legis Ann, 1981, p 256.)
This court is satisfied that a tenant, commercial or residential, need no longer prove “forcible” eviction in order to come within the provisions of RPAPL 853; he need only prove that the eviction was unlawful or that unlawful means were used. Accordingly, the court concludes that plaintiff took the law into his own hands by intentionally and tortiously evicting defendant in April, 1980, by chaining and “padlocking” defendant out of the premises. Defendant has, therefore, proved its entitlement to the treble damages provided for in RPAPL 853. The court further finds that the award of treble damages to defendant herein is in accord with general policy considerations for granting punitive damages enunciated by the Court of Appeals in Walker v Sheldon (10 NY2d 401).
*443 DAMAGES
The defendant, having proved by competent testimony and documentary evidence that it paid $16,000 for the business (including $2,000 for store fixtures), $9,500 for inventory, and $2,500 legal fees related to the said purchase, it is awarded $28,000 compensatory damages; said sum is trebled to $84,000.
Defendant is also entitled to treble damages for the unexpired term of the lease of which it was unlawfully deprived by plaintiff. The rule set forth in Randall-Smith {supra) provides that the proper measure of damages in such instances is the difference between fair market value and the rent reserved in the lease, multiplied by the unexpired term, and then reduced to its “present value” as shown in standard valuation tables. (While that case pertained to an actual partial eviction, and there appears to be no reported case of any actual total eviction as the case at bar, the formula enunciated in Randall-Smith, Inc. v 43rd St. Estates Corp. {supra, p 103), complies with the mandate of the Court of Appeals of neither overcompensating one party nor unduly penalizing the other.)
Defendant’s real estate expert, a neighborhood broker, established that the store, including basement space, had a fair market value of at least $8 per square foot ($16,000 per annum) predicated upon its peculiar suitability for a food market (larger than other stores in vicinity, double display windows, two entrances, semimodern metal storefront and interior, and direct street-to-basement loading facilities without entering the store itself). The rent spelled out in the lease was only $8,400 for 1983-1988.
New York University Professor James R. Knickman, an economist, testified in defendant’s behalf that under standard valuation tables[5] a discount rate of 2.5% should be applied to compute present value of the damages from 1983 through 1988,[6] and that the present value of $1 per year under said tables for five years at said discount rate is $4.76. Applying the rule in Randall-Smith (supra), and the guidelines provided by defendant’s expert, Professor *444 Knickman, which were not contradicted by plaintiff, the difference between the fair market value of $16,000 ($8 x 2,000 square feet) and the lease rent of $8,400 is $7,600. Multiplying that amount by the unexpired lease term of five years, the total damage award is $38,000 or $114,000 trebled. When said amount is reduced to its present value, the total damage award for this item of loss is $108,528.[7]
The same formula must also be applied to the earlier period of 1980 through 1983 when the eviction first occurred. The lease rental at that time was only $7,200 per annum which must also be deducted from the fair market value of $16,000, resulting in a differential of $8,800, multiplied by the three-year term, or $25,667.[8] This amount trebled is $77,001. (Since this last computation represents past years, rather than an award today of future dollars, no issue of present value reduction exists and defendant is therefore entitled to the total undiscounted sum.)
The court awards the defendant the total sum of $269,529 consisting of compensatory damages: $84,000; the value of the unexpired lease term: $108,528; and the value of the lease from 1980 to March, 1983: $77,001. The court denies, however, defendant’s counterclaim for loss of profits on the basis of totally insufficient proof as herein set forth.
The store’s prior owner, Giovanni Scalera, testified in support of defendant’s counterclaim for loss of profits, that his 1979 net profit had been $19,300;[9] that his accountant was dead; that all his books, records and tax returns were lost when Hassine evicted defendant and himself. Gregory Masone, the present tenant, subpoenaed as an adverse witness by defendant, stated, incredibly, that he was unable to recall either the amount of his profit (only that he and partner draw $105-$125 weekly) or even the surnames of his employees (but that he paid them $3.35 per hour for 50 hours). He also said his mother, Mary Ann Masone, an *445 officer of the plaintiff, contributed her time, gratis, to the business.
Lost profits are recoverable as damages where they result as the natural and probable consequences of a tortious act; and although lost profits need not be proven with exactitude, they must be demonstrated with sufficient certainty and may not be speculative. (342 Holding Corp. v Carlyle Constr. Corp., 31 AD2d 605; Hughes v Nationwide Mut. Ins. Co., 98 Misc 2d 667; 13 NY Jur, Damages, §§ 108, 109, pp 582, 584; 25 CJS, Damages, § 90, p 974.) Additionally, recovery for lost profits will usually be permitted only where a business is firmly established and in operation for a definite period of time. (Hughes v Nationwide Mut. Ins. Co., supra, p 673; Bankers Trust Co. v Steenburn, 95 Misc 2d 967; Mullen v Jacobs, 58 Misc 2d 64; see, also, Miller v Lasdon, 78 AD2d 628.)
The court finds that neither the testimony of Scalera nor Masone furnished any reasonable basis upon which to award lost profits. Scalera’s testimony was not based on any tangible, definitive evidence and Masone’s testimony was totally incredible and clearly designed to frustrate the award of fair and equitable damages. The court is mindful of the rule that a wrongdoer should not be permitted to benefit from his own tortious acts (West St. Auto Serv. v Schmidt, 26 AD2d 662; Rand Prods, v Mintz, 69 Misc 2d 1055; Fuld, 9 Encyclopedia of NY Law, Damages, § 3, p 6), and that Hassine’s tortious eviction of the defendant prevented defendant from ever operating so that loss of profits could not be demonstrated with more exactitude. Similarly, Scalera was prevented from recovering his books and records — thereby making any competent proof of lost profits virtually impossible. Despite the foregoing, the court denies defendant’s counterclaim for loss of profits as same are purely speculative and not supported by the evidence. Defendant’s business was not an established one and it was impossible to determine from Scalera’s testimony from whence he had actually drawn the $19,300 in 1979.
The parties having waived the formal findings of fact and law, the within decision shall constitute the same. Plaintiff’s request for a declaratory judgment in its favor is *446 denied and judgment may be entered by the defendant on its counterclaim in the sum of $269,529, plus interest, costs and disbursements.

. Sir Walter Scott, Marmion, Canto VI, st 17.

. Scalera’s answer in the summary proceeding specifically pleaded the existence of the lease as an affirmative defense: “Tenant is in possession of a lease dated March 22, 1978 between Abraham Eagle, as landlord, and Shoman Brothers Corp., as tenant. Such lease was assigned to respondent on December 26, 1978, which provided rental at the rate of $500.00 a month”.

. Testimony, Gregory Masone, Supreme Ct, March 14, 1983, p 5.

. See George v Time, Inc., 259 App Div 324, affd 287 NY 742; Rossbach v Rosenblum, 260 App Div 206, affd 284 NY 745; Ford Tank Maintenance Co. v Ford, 24 Misc 2d 261; Richardson, Evidence [10th ed], §30, p 18; Fisch, NY Evidence [2d ed], § 1065, pp 602-603.

. Financial Compound Interest and Annuity Tables, 6th ed, 1980, p 1495.

. Said discount rate of 214% is derived by dividing the average interest rate of 1.0867 (8.67%) by a 6% inflation rate, expressed as 1.06%.

. Said sum is arrived at by multiplying $7,600 by $4.76 which equals $36,176, trebled is $108,528.

. The sum of $733.33 has been deducted for March, 1980-April, 1980 since defendant was not entitled to possession until late April, 1980.

. Testimony of Giovanni Scalera, March 14, 1983, pp 32-34.