**MEREX A.G., Merex Corporation and Peter C. Lachmann, Plaintiffs,**

v.

**FAIRCHILD WESTON SYSTEMS, INC., Defendant.**

**No. 85 Civ. 6596 (MJL).**

United States District Court, S.D. New York.

Jan. 6, 1993.

1358

Daniel J. O'Callaghan, New York City, for plaintiffs. ·

Arent Fox Kintner Plotkin & Kahn, New York City (Roy A. Klein, Ronald W. Weiner, of counsel), for defendant.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

Plaintiff, Merex A.G. ("Merex"), is an international trading and brokerage company located in what was formerly known as West Germany. Defendant, Fairchild Weston Systems, Inc. ("Fairchild"), is a United States corporation whose principal place of business is Syosset, Long Island, New York. This action is brought under the diversity jurisdiction of the Court.[1] 28 U.S.C. § 1332.

This action grows out of Merex's claim that it is entitled to collect a fee or commission, pursuant to an oral agreement, for introducing Fairchild to the Peoples Republic of China ("PRC") where a business opportunity was consummated between defendant and the PRC.

The claims for breach of contract, quantum meruit and declaratory judgment were dismissed after hearing on defendant's Fed.R.Civ.P. 50 motion. Since the only remaining claim was an equity claim of promissory estoppel, the Court informed the parties that the trial would proceed with the jury sitting as an advisory jury.[2] The jury returned a general verdict for plaintiff. Defendant timely moved for the Court to render a verdict for defendant. Plaintiff moved for recusal.

1. Named plaintiff Merex Corporation was dismissed during trial; named plaintiff Peter Lachmann and defendant settled during trial.

2. Where legal claims have been dismissed and only equitable claims remain, it is common practice to deem the jury an advisory jury for purposes of the equitable claims. *E.g., Sterling v. Environmental Control Bd.,* 793 F.2d 52, 54–55 (2d Cir.), *cert. denied,* 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986); *Morrison v. United States Lines,* No. 80 Civ. 5112 (S.D.N.Y. March 2, 1983) (LEXIS, Genfed Library, Dist file). *See generally* 9 Charles A. Wright & Arthur A. Miller, *Federal Practice and Procedure* § 2337, at 130 (1971) ("[J]ury and nonjury issues ... may be tried simultaneously, with the jury rendering a verdict on the jury issues and the court making findings on the nonjury issues. The matter is in the discretion of the court so long as the order of trial is so arranged that it preserves the right of trial by jury on the jury issues.").

*Rule 39. Trial by Jury or by the Court*

(a) *By Jury.* When trial by jury has been demanded as provided in Rule 38, the action shall be designated upon the docket as a jury action. The trial of all issues so demanded shall be by jury, unless (1) the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury or (2) the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the Constitution or statutes of the United States.

\* \* \* \* \* \*

(c) *Advisory Jury and Trial by Consent.* In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury ...

*Rule 52. Findings by the Court; Judgment on Partial Findings.*

(a) *Effect.* In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action....

### Findings of Fact

Plaintiff Merex alleged that in the late Summer of 1982 Robert Neasham ("Neasham"), defendant's European market manager, approached Gerhard Mertins ("G. Mertins"), the president of Merex, at his office in West Germany, and informed him that Fairchild would be interested in selling its system of military aerial surveillance cameras—the LORAP/MTRF System—to the PRC.[3] Fairchild had no contacts with the PRC, and Mertins had an ongoing business relationship with that country.

G. Mertins alleges that at the meetings with Neasham in the late summer of 1982 he informed Neasham that such a deal could be arranged but he required a ten percent commission—an amount later reduced to eight percent. G. Mertins testified that no distributorship was discussed and that he and Neasham agreed he would earn his commission upon any Fairchild sale to the PRC. They shook hands on the deal. G. Mertins believed he had reached an agreement with Fairchild through Neasham. G. Mertins testified:

I asked him what is your authority? How long have you been with the company? He told me he was a lieutenant colonel in the Navy [sic] ...

I told him: We are together, the two old soldiers, and we have a good understanding. He [Neasham] said: Naturally, Fairchild is a generous company. And ... he asked me: What is your request? I said: We are making such deals normal on the base of 10 percent of the sales value ...

And he agreed. He said: Even if it is going—he promised even more. I said: No, we will make the deal for 10 percent. He was agreed.... [W]e confirmed our agreement with [sic] shake hand.[4]

G. Mertins further testified that his German attorney advised him that such an oral contract was valid and enforceable under German law.

On August 26, 1982, Merex telexed Fairchild:

To efficiently pursue projects, it will become necessary for us to be granted your rights to act as Fairchild distributors. Kindly consider this matter and advise.[5]

Neasham testified by deposition that during the meeting with G. Mertins:

It was explained in exactly the terms that I had authorization to do. We could sell to Merex Corporation the systems

---

**3.** Peter Lachmann, Fairchild's sales representative in Europe, introduced the parties and was present at their meetings.

**4.** Trial Tr. at 342–343.

**5.** Trial Ex. B; Trial Tr. at 446–448.

involved, they would be, in turn, for Merex to mark it up and sell those to the Peoples Republic of China ...[6]

Neasham further testified:

Mertins, G.G. Mertins—not anybody else—said that he could provide the financial arrangements to finance us under our normal government schedule of payments, and he would take the payment from the Peoples Republic of China and carry that financial burden. That's why he could mark it up for resale.[7]

\* \* \* \* \* \*

Merex said he had enough money to do this, and that was going to be his role in this thing, was to carry on marketing activity and the liaison, and he would resell the system ... to the PRC.[8]

When asked if commissions had been discussed, Neasham replied:

There were no commissions. Commissions were the big problem area in these things because these people were not a sales representative; they were a group, a company that wanted to buy these things, buy these things and resell them. There was no commission, nothing. And I wouldn't be able to discuss that anyway.

There was [sic] no commissions discussed at this meeting primarily because I am not authorized by my company to state company policy on commissions per se, as to their amount.... That is the company lawyer—Legal and Executive Departments that do those things.[9]

Lachmann testified:

Neasham's proposal was to pay to Merex, on a sale/resale basis their requested recompensation or commission, and the amount that remained, Merex did request at that time, 10 percent of the sales price, which would be reached in their—with the contract with the Peoples Republic of China.

Mr. Mertins felt very clearly at the beginning, in the first meeting, and following on in the next meetings in that summer [with Neasham], that an arrangement or how the commission or the recompensation [sic] of Merex should be structured is not in the hands of Merex nor in the hands of Fairchild because this depends largely on the wish of the customer of the Peoples Republic of China.

So Mr. Mertins said that no matter how this 10 percent would be structured, as long as Merex, A.G. would get paid, they would accept it, no matter which type of structuring of this 10 percent should be paid finally.[10]

Regarding Neasham's response, Lachmann testified:

Fairchild surely would pay a commission, and Mr. Neasham brought in the discussion concerning the sale/resale ... the commission on a sale/resale basis through a mark up.[11]

Pighi and Lay testified that Fairchild was reluctant to do business in China in 1982 because China was just coming out of the cultural revolution and there was much instability in the country. Because of these conditions, Fairchild did not want to deal directly with the Chinese. Merex and G. Mertins, however, impressed Fairchild as well-connected and sophisticated, particularly with respect to the PRC. Fairchild decided to explore its possibilities with Merex.

In late August, 1982, Merex set up a meeting between Lachmann, Neasham and a delegation from NORINCO, a PRC purchasing agency. Neasham made a presentation of the LORAP camera system, and G. Mertins, Lachmann and Neasham were invited to the PRC for further discussions. In September of 1982, G. Mertins travelled to Fairchild's headquarters in New York and met with Louis Pighi, President of

6. Trial Tr. at 1574.

7. Trial Tr. at 1580.

8. Trial Tr. at 1581.

9. Trial Tr. at 1575. Neasham testified that he informed G. Mertins that he had no authority to

bind Fairchild, and that only a corporate officer could. Trial Tr. at 1587.

10. Trial Tr. at 55–56, 230.

11. Trial Tr. at 57. Mr. Lachmann is a German National and English is his second language.

Fairchild, and Chris Lay, Fairchild's vice-president.

Fairchild, at the September meeting, told G. Mertins that the only way they would consider a deal with the PRC was for Merex to secure the financing. Fairchild would sell the camera system to Merex, and Merex would add to the Fairchild ex-factory price a sum for a Merex commission. Merex was then to negotiate a resale to the PRC. Mr. Lay testified that the sale/resale format was proposed so that Merex would take the risk of negotiating and collecting against a payment clause [Clause 22].[12] Fairchild would assume the responsibilities of manufacturing the cameras per the PRC specifications, installing them on the military airplanes, and supervising their functioning for a limited period.[13]

All parties agree that they discussed the proposed sale to the PRC in terms of a distributorship, or sale/resale on back to back contracts, in which Merex was to receive a commission by marking up Fairchild's price and re-selling to the PRC.

G. Mertins testified that he believed the sale/resale was nonsense and rejected the proposal. After he returned to Germany, he continued his efforts with the Chinese. He testified that he did so based on the handshake agreement he made with Neasham.[14]

On October 6, 1982, G. Mertins wrote Lay:

> For reasons verbally explained, we would like to work as distributors for you.[15]

Accepting the August invitation extended in West Germany by the PRC delegation, G. Mertins, Lachmann and Neasham met with the PRC purchasing delegates in Beijing from November 7 through November 19, 1982. During these meetings, Lachmann and Neasham presented technical details of the LORAP/MTRF system to various PRC representatives. Neasham had proposed a sale of five systems. At the close of these meetings, at Neasham's request, the PRC prepared a proposed Letter of Intent. Neasham found the PRC form unacceptable. He then prepared a new Letter of Intent which was accepted by NORINCO. This document was executed by the PRC on November 19, 1982.

The PRC Letter of Intent addressed to Neasham states:

> We intend to purchase from Fairchild Weston Systems Inc., 300 Robbins Lane, Syosset, New York 11701, U.S.A. a quantity of long range aerial panoramic photographic system. [sic]

G. Mertins next met with Fairchild executives on Long Island in January, 1983.[16] They again discussed the sale/resale proposal and the markup of Fairchild's price as the method of payment of the Merex commission.

In a memorandum dated February, 1983,[17] Merex summarized the results of the January, 1983 meeting as follows:

> It is intended at present that Merex will submit this offer as Fairchild's representative to the Chinese on Merex paper. The prices of this contract are Fairchild ex factory prices on which we will have to add our addition.

"This contract" referred to in the memorandum was later presented to Merex by Fairchild as a draft contract and was called the "Blue Book." Merex continued to negotiate with the Chinese on the basis of this draft proposal. Mr. Wennmann, a Merex employee conducting the China negotiations, reported in a telex dated June 9, 1983:

---

12. Merex's responsibilities for financing and negotiating were set out in the Blue/Red Book called the "Commercial" part of the proposed contract.

13. This was called the "Technical" part of the proposed contract.

14. Trial Tr. at 377–387.

15. Trial Ex. "C".

16. There were two subsequent meetings between G. Mertins and Fairchild executives in New York on April 1, 1983, and in January, 1984. A delegation of PRC military and scientific experts travelled to Long Island to inspect the Fairchild facilities in November, 1983.

17. Trial Exs. LA, LB; Trial Tr. at 448–451.

[T]he contract will be back to back except for prices ...[18]

A later and final contract proposal between Merex and Fairchild was known as the "Red Book".[19] It consists of forty eight single spaced typewritten pages and fourteen annexes. The undisputed testimony is that the Red Book was used by the parties in the spring of 1984 in negotiations with the Chinese.[20] The Red Book provided in pertinent part:

Clause 21.1:

This contract contains all the covenants, stipulations and agreements of the parties. Buyer and seller agree that all prior information, inquiries, seller's general terms of sale etc., not included in this contract are hereby expressly renounced and neither party shall be bound by nor liable for, any statement, representation, promise or agreement not set forth herein.

Clause 21.2:

Any amendments and/or supplements to this contract shall be valid only if made in writing and signed by both parties hereto.

Clause 29.1:

This contract will take effect and bind the parties only after being executed by both contracting parties, and upon payment of the first advance payment of U.S. $13,375,000.00 provided for in Clause 22.1

The parties to the contract were identified as Fairchild Weston Systems, Inc. ("Seller") and Merex A.G. ("Buyer").

The testimony of the parties was in direct conflict as to the events during negotiations with the PRC during and after March, 1984. The only factual agreement of the parties is that negotiations pursuant to the terms of the "Red Book" broke off in April, 1984, and that in September, 1984 Fairchild entered into a direct contract of sale for two LORAP camera systems for which the PRC paid Fairchild $20,300,-000.00.

Mr. G. Mertins testified that after his son, Helmut Mertins ("H. Mertins"), graduated from college in 1983, he put him in charge of the LORAP sale. H. Mertins testified that in the latter part of February, 1984, he received the Red Book from Fairchild with a cover letter (Ex. YY). At that time the sale/resale format was used by the parties in negotiating with the PRC. Merex was to negotiate the commercial side of the proposal and Fairchild the technical side. Both sides were to be present during any negotiations.

The Red Book proposal was for five systems at a price of $53,500,000, *ex factory*, from Fairchild to Merex. Prior to this time the PRC was told that the price to them was $54 million (Blue Book).[21] During negotiations, H. Mertins had telexed the PRC that the final price would be increased based on some scope changes to the system.

In January, February, and March of 1984, both G. Mertins and H. Mertins were in Germany. Mr. Lay, vice president of Fairchild, was in China discussing the technical aspects of the proposal.

On March 24, 1984, Mr. Lay sent the following telex to Gerhard and Helmut Mertins.[22]

I had a meeting with Mr. Zhao Fei this morning. Tomorrow he wants to have technical meeting about pod modification.... Mr. Zhao Fei spoke to me directly on the commercial part and he indicated strongly that he desires your

---

**18.** Trial Ex. U. Stephen Wahl, Secretary and General Counsel to Fairchild testified:

In a sense, the whole contract was a pass through, in terms that the Merex contract with the Chinese was intended to be essentially a mirror image of this contract with a mark-up for Merex's profit.

Trial Tr. at 1058.

**19.** Trial Ex. MM.

**20.** Helmut Mertins, son of Gerhard Mertins, testified that as of March, 1984, Merex intended to proceed with the sale/resale arrangement based upon the Red Book proposal. Trial Tr. 843–844.

**21.** Trial Tr. at 832. The Blue Book proposal was that Fairchild would charge Merex $52 million and Merex would mark up the price to the PRC to $54 million.

**22.** Trial Ex. GGG; Trial Tr. at 1369.

presence here for the commercial discussions. Would appreciate you trying to get over here as fast as possible.

The next day, March 25, Mr. Lay sent the following telex to Fairchild (Pighi and Kraljic):

1. No Red Books from Merex.[23] Sponsor [PRC] is very upset. Please send me five Red Books by DHL immediately. His concern is that they cannot handle Clause 22 [the payment clause].

\* \* \* \* \* \*

4. After we finish technical, sponsor has told me he wants to get into commercial and finish it this trip. I will need our Clause 22 in case sponsor wants to go that way. Joe [Kraljic], you know how to write it for LHP [Mr. Pighi] approval. Send it as soon as possible.[24]

On March 26, 1984, Lay telexed Pighi:[25]

Note: Senior Merex representation is making things very touchy.

Mr. Lay testified that Zhao Fei wanted to move ahead with the negotiations and required a senior Merex person to be present. As of this date he had received no response to his telexes to Merex.[26]

On March 27, 1984 Mr. Lay sent the following telex to Mr. Pighi:[27]

Successfully completed remaining technical matters with Air Force personnel, I hope. I am told we will start commercial discussion day after tomorrow. We have an all court press on to let's sign Anna. [Anna was the code name the parties used for the proposed sale.] No Merex. Will keep you posted.

On March 30, 1984, Mr. Lay again sent the telex of March 24th to Merex.[28]

On April 1, 1984, plaintiff received the following telex from Mr. Lay:

URGENT/URGENT

URGENT

PLEASE DELIVER ASAP

Bad news. Today I started discussions with sponsor on commercial portion of Anna contract. To my surprise he had a copy of Red Book with all pricing that I had given to you in Germany. This was Fairchild price to Merex. I am at a complete loss why you would give him that book, as I am sure you can appreciate it is going to be extremely difficult to negotiate up, whether it would be five systems or two.

As I have told you before, there is not money in my quote to you to accommodate your commission requirement. Plus all signs appear to me that we are headed for a tough price negotiation.

So if you are coming Tuesday to help out in these negotiations, be prepared. Also your clause 22 is anxiously awaited by the sponsor. If you do not plan to come to PRC, please let me know so I can adjust plans.[29]

Mr. Lay testified he sent the telex because Zhao Fei was very emphatic that he wanted to deal with Mr. G. Mertins.

On April 4, 1984, a telex was sent from Wahl to Lay.

There are a few changes that should be made in the Red Book to reflect contract directly between Fairchild/PRC.

Finally price is reflected below. Enclose, and clause 22 includes only Lachmann.[30]

23. Mr. Lay testified he sent the technical part of the Red Book to the PRC before he left for China in early March. The reference in the telex was to the commercial part, prepared by Merex.

24. Trial Ex. HHH; Trial Tr. at 1373–74.

25. Trial Ex. III; Trial Tr. at 1390.

26. Trial Tr. at 1390.

27. Trial Ex. JJJ; Trial Tr. at 1391.

28. Trial Ex. 35; Trial Tr. at 1392–93.

29. Trial Ex. 83; Trial Ex. MMM; Trial Tr. at 1395–96. H. Mertins testified that he canvassed his employees and telexed back that no prices were transmitted by Merex to the buyer. Mr. Lay, however, testified that Mr. Bucholz of Merex admitted to giving the Red Book to the Chinese. Trial Tr. at 1397. Bucholz did not testify.

30. Mr. Lay testified that Merex was not included in the newly drafted Clause 22 because there was no relationship with Merex other than that of manufacturer and distributor, and when this relationship eroded there was no need to consider any contingency. Trial Tr. at 1065. Mr. Wahl testified that he sent the telex because Mr.

Mr. H. Mertins arrived in China on April 5th and met with Mr. Lay on the 6th. He testified that at that meeting Lay told him that the quantity was now reduced from five to two systems. He further stated that financing was no longer required and that Fairchild and Merex would sign a contract with the PRC. H. Mertins testified:

I asked Mr. Lay how we were to be paid, and he said ... Merex A.G. would receive 8 percent commission payment upon the sale of the systems to the Chinese, and ... Mr. Lay and I also further agreed that if it becomes necessary, that this payment could be reduced to 6 per cent, if necessary, price negotiations required them.... I agreed.

\* \* \* \* \* \*

The sale/resale format would be dropped ... Fairchild would negotiate directly with China ... [and] Merex would be informed by Fairchild when it came time to sign the contract so that we would come to China and jointly sign the contract with Fairchild.[31]

This Court does not credit this testimony.

After this discussion with Mr. Lay, H. Mertins later went to a room where the negotiations were taking place. He testified that Mr. Neasham barred the door and told him Merex was no longer needed in the negotiations. H. Mertins withdrew and returned to Germany.

Neasham and Lay testified that Fairchild became involved in this project because it relied on the financial ability of G. Mertins as a successful international trader and his apparent good relations with Zhao Fei. Lay became concerned when G. Mertins absented himself from the contract negotiations in China. After he sent the urgent telexes to Merex requesting G. Mertins' presence, he testified:

Mr. Bucholz [an employee of Merex] came to me and informed me that Mr. Helmut Mertins was coming to China, and my reaction to Mr. Bucholz was: I am very disappointed. We need Mr. G.G.

Mertins in China, and there's no way that young Mr. Helmut Mertins is going to be able to handle the problem we are in right now. It is Mr. G.G. Mertins that has the rapport, and I was very upset with the message I had received, and I told him he could pass that information back to Merex, and he could possibly save Helmut a trip. And he informed me that Helmut was really coming on some other business also.[32]

Mr. Lay testified that the contract negotiations collapsed. The PRC delegation said they were interested in the LORAP cameras but had no money to pay for them. Lay returned to New York.

The evidence disclosed that after Lay returned home, Fairchild maintained contact with the PRC. Lay testified that in August, 1983, Zhao Fei contacted him and told him to return to the PRC, that they had the money for two LORAP systems.

Mr. Lay testified that he returned to the PRC and negotiated a direct sale of two systems from Fairchild to the PRC for a price of $20,300,000. The contract was signed in September, 1984.

H. Mertins testified that he waited to hear about the negotiations, and in November, 1984 he telexed Norinco as to the status. Exhibit 38 is the telex he received in reply:

"Anna Project was signed by Fairchild."

The witness then communicated with Fairchild and requested payment. Fairchild responded that Merex had a distributorship and could not expect to be paid.

At the close of plaintiff's case, defendant made a Fed.R.Civ.P. 50 motion. On oral argument, the Court could not obtain a straight answer from plaintiff's counsel as to the contract theory of his First Claim. Plaintiff's counsel argued that G. Mertins relied on the oral promise made by Neasham in Germany in August, 1982. He con-

---

Lay was upset and asked for a backup Clause 22 because the Merex organization had not come to China to negotiate. Trial Tr. at 1397–1404, 1406.

**31.** Trial Tr. at 786–88.

**32.** Trial Tr. at 1399.

tended that German law was applicable to the enforceability of the oral contract.

In the alternative, plaintiff's counsel argued that when G. Mertins went to Fairchild headquarters in September, 1982 and was informed by Fairchild executives that the only way the defendant would proceed with the sale was by a back to back sale/resale agreement, plaintiff informed Fairchild that the PRC would never accept such an arrangement. Plaintiff's counsel contended that plaintiff accepted defendant's sale/resale proposal only as a mechanism to get the deal done, and at no time did Merex accept the sale/resale arrangement as a replacement for the alleged oral promise.

Defendant argued that as soon as Fairchild was informed of the Neasham/Mertins conversations, G. Mertins was invited to Fairchild's headquarters and was told that the only terms of doing business were through back to back contracts. Defendant contended that G. Mertins accepted this proposal in his October 6, 1982 letter to Fairchild, and subsequent negotiations between the parties were pursuant to this mutual understanding.

Defense counsel argued that the oral contract plaintiff alleged was unenforceable in New York State under the Statute of Frauds. Defendant moved for dismissal of the entire case.

### RULINGS OF LAW

#### I.

Before reaching the substance of this case, the Court must consider plaintiff's motion for recusal. The Court finds that the recusal motion is woefully inadequate. Fairchild identified three independent and adequate grounds supporting this conclusion:

(A) Merex's allegations of judicial misconduct during trial are insufficient as a matter of law to warrant recusal; (B) Merex has not carried its burden of establishing that [this Court] acted with bias; and (C) Merex has not demonstrated that any alleged animosity on [this

Court's] part was directed against Merex rather than against Mr. O'Callaghan.

Defendant's Memorandum at 4. Fairchild's argument amply demonstrates the shortcomings of plaintiff's motion.

#### II.

#### *Choice of Law*

#### *Oral Contract*

■ Merex argued that the oral commission agreement in Germany between G. Mertins and Neasham in August, 1982, is governed by German law and is enforceable in New York courts. He alleged that: the contract negotiations took place in Germany between Neasham and G. Mertins; plaintiff performed in Germany where his business is located; and German law would recognize an oral brokerage contract.

Fairchild argued that: the defendant was located in New York; the goods in question were manufactured and shipped from New York; the key meetings between the parties took place in New York; and the plaintiff chose New York as the forum for the litigation.

Under this forum's conflict rule, New York courts would apply the "paramount interest" test, *Hutner v. Greene*, 734 F.2d 896 (2d Cir.1984), in choosing the applicable law of decision in this case. In *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576, 581 (1969), the New York Court of Appeals defined the test:

[T]he law of the jurisdiction having the greatest interest in the litigation will be applied and the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.

(citing *Miller v. Miller*, 22 N.Y.2d 12, 15–16, 290 N.Y.S.2d 734, 737, 237 N.E.2d 877, 879 (1968)).

The law in conflict in this case is the law of Germany which would recognize an oral brokerage contract, and the law of New York (General Obligations Law § 5–701(a)(10)—Statute of Frauds) which does not.

The legislative history of the Statute of Frauds reveals that the New York legislature was concerned that courts were clogged with oral brokerage contract cases which all too often degenerated into swearing contests. In order to protect New York courts from what was perceived to be widespread perjury, the legislature required that such contracts, in order to be enforceable in New York courts, be in writing subscribed by the party to be charged. *See Intercontinental Planning Ltd. v. Daystrom*, 24 N.Y.2d at 382–83, 300 N.Y.S.2d at 825, 248 N.E.2d at 581; *William J. Conlon & Sons, Inc. v. Wanamaker*, 583 F.Supp. 212 (E.D.N.Y.1984). New York's policy of protecting its residents from unfounded finder's fee claims is clear whereas Germany's interest in protecting the reasonable expectations of its residents is much less apparent. *See Denny v. American Tobacco Co.*, 308 F.Supp. 219, 223 (N.D.Cal.1970) (applying similar reasoning to the choice between New York and California law).

The essence of the business relationship which plaintiff alleged in its contract claim was that Merex was to provide Fairchild an entrance into the markets of the PRC and provide the "know-who" and "know-how" in negotiating a business opportunity, *i.e.*, the sale of LORAP camera systems. This relationship is clearly a "business opportunity" under N.Y. General Obligations Law § 5–701(a)(10). *Freedman v. Chemical Constr. Corp.*, 43 N.Y.2d 260, 267, 401 N.Y.S.2d 176, 181, 372 N.E.2d 12, 16 (1977); *see also Seven Star Shoe Co. v. Strictly Goodies, Inc.*, 628 F.Supp. 1237, 1240 (S.D.N.Y.1986).

Under the rule of *Intercontinental Planning*, where the parties negotiated key provisions in this jurisdiction, the defendant resided in this state, and the case was brought here, there are sufficient contacts with New York to give New York a substantial interest in applying its policy. New York Courts would rule that a business broker's claim for commission pursuant to an oral contract would be unenforceable in New York courts. *Minichiello v. Royal Business Funds Corp.*, 18 N.Y.2d 521, 526–27, 277 N.Y.S.2d 268, 271–72, 223

N.E.2d 793, 795–96 (1966), *cert. denied*, 389 U.S. 820, 88 S.Ct. 41, 19 L.Ed.2d 72 (1967).

This Court granted the defendant's Rule 50 motion and dismissed the First Claim insofar as plaintiff relied upon an oral commission contract.

### III.

#### *The Crabtree–Doctrine*

#### *Written Contract*

After this Court's ruling that the alleged oral contract would not be enforceable under the New York Statute of Frauds, plaintiff argued, in the alternative, that there were sufficient writings found in defendant's internal documents which, when read together, satisfied the Statute under the holding of *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 110 N.E.2d 551 (1953). Plaintiff's counsel has spilled much ink over the issue of the admissibility and relevance of Fairchild's internal files, whether called "Sales Inquiry Files," "Work Authorization Files," or "Pricing Files" in order to satisfy the *Crabtree* doctrine.

Plaintiff's counsel was authorized, after defendant moved earlier in the litigation for summary judgment, to conduct discovery on the limited issue of whether there was a sufficient writing subscribed by defendant to support the claimed oral commission agreement. In response to plaintiff's demands, defendant furnished hundreds of documents from its internal accounting files.

An examination of those files revealed that in calculating the cost of the proposed deal, the pricing files included such statements as:

(1) *Current agreement with Merex:*

We quoted $52 Mill. Merex quoted $54 Mill. We will accept $50 Million and Merex gets its differential of $4 Million or 8% commission.

Merex will finance us for the additional funding we need (Max of $11 Million) and absorb the interest cost (approximately $1 Million out of its com-

mission—(equal) to Lachmann 2%, so Merex realizes 6%.[33]

L.H. Pighi is looking to reduce the total commission received by Merex and Lachmann to 13% combined. Therefore if you take the price

$$\begin{array}{r} \text{of} \quad \$43,200,000 \quad \text{and add the} \\ 13\% \quad \underline{6,500,000} \\ \$49,700,000 \quad \text{we will break} \\ 50,000,000 \ ^{34} \end{array}$$

From these examples, plaintiff argued that it is implicit through projections and computations by Fairchild's employees that Fairchild recognized that Merex was entitled to be compensated on a commission basis, and that therefore these computations are sufficient memoranda under *Crabtree* to prove that the commission was payable on a direct sale to the PRC.

Plaintiff also argued that in statements made by defendant's officers and employees during their depositions, they had referred to "commission to Merex" in their internal files, and thereby supported his claim. However, a fair reading of the deposition testimony discloses that the phrase "commission to Merex" was used in the context of negotiating the ongoing sale/resale format.[35]

■ Under New York law, plaintiff may not use parol evidence to establish any term of the alleged agreement. The internal Fairchild documents themselves [36] must be sufficient, as a matter of law, to prove the oral contract alleged, *i.e.*, that defendant promised to pay plaintiff a commission if defendant made a direct sale of the LORAP cameras to the PRC. *Bazak Int'l Corp. v. Mast Indus., Inc.*, 73 N.Y.2d 113, 538 N.Y.S.2d 503, 535 N.E.2d 633 (1989). In *Bazak*, Judge Kaye, writing for the Court, stated:

> Parol evidence, even in affidavit form, is immaterial to the threshold issue whether the documents are sufficient on their face to satisfy the Statute of Frauds.

Consideration of parol evidence in assessing the adequacy of a writing for Statute of Frauds purposes would otherwise undermine the very reason for a Statute of Frauds in the first instance. That issue must be determined from the documents themselves, as a matter of law (*see, Scheck v. Francis*, 26 N.Y.2d 466, 472, 311 N.Y.S.2d 841, 260 N.E.2d 493). Accordingly, the trial court erred in ruling that the Statute of Frauds issue should be determined as a matter of fact at trial, and to the extent that plaintiff's arguments are based on parol evidence set forth in Bazak's affidavits, we disregard them.

73 N.Y.2d at 118, 538 N.Y.S.2d at 505, 535 N.E.2d at 635.

■ The documents primarily relied on by plaintiff in the instant case were the internal files of defendant prepared by accountants, engineers, and other employees of the defendant. These files were work sheets setting forth Fairchild's estimates of the pricing of the LORAP system. Mr. Pighi testified that he would review the documents, and if he thought the price was adequate for the work involved, he would approve them. He had the last word on price.[37] None of the employees generating these documents, including Mr. Egan, the comptroller, had the authority to bind the company to anything contained in those files. Nowhere in any of those files is there a single paper evidencing the terms of the oral contract alleged, nor is there a single document subscribed by Mr. Pighi, the President of Fairchild, or his duly authorized agent supporting plaintiff's claim. Nor were the file references—"commission to Merex"—subscribed by the makers of those files with the intent to authenticate such statement as a contractual commitment to pay a commission to Merex on any sale to the PRC. Rather, the phrase was used to describe a component in developing

---

**33.** Undated document in the files of Thomas Egan, former controller of Fairchild. Trial Tr. at 1089–90.

**34.** Memo to Chris Lay dated September 15, 1983.

**35.** Trial Tr. at 1089–1092.

**36.** The contract proposals referred to earlier as the Red Book and Blue Book were never signed by either party.

**37.** Trial Tr. at 1534.

a tentative pricing budget.[38] *Scheck v. Francis*, 26 N.Y.2d 466, 311 N.Y.S.2d 841, 260 N.E.2d 493 (1970); *see also Dorman v. Cohen*, 66 A.D.2d 411, 413 N.Y.S.2d 377, 379 (1979) ("[T]he memorandum relied on by plaintiffs establishes at most a contract materially different from the contract which forms the basis of plaintiffs' claim ...").

It is undisputed on this record that the Blue Book, later revised and called the Red Book, was a forty-eight page single spaced typewritten document with fourteen annexes which provided that Fairchild would sell the camera systems to Merex, and that Merex would add a sum of money to the Fairchild price for its commissions and sell the camera systems to the PRC for the enhanced figure. The Blue Book and the Red Book provided:

> This contract will take effect and bind the parties only after being executed by both contracting parties, and upon payment of the first advance....

It is equally undisputed on this record that plaintiff and defendant negotiated with the PRC in accordance with the provisions of the Blue Book/Red Book proposed contracts.

In light of the uncontested negotiating posture of the parties from the autumn of 1982 through March of 1984, it is counterintuitive to suggest that the internal documents of Fairchild—compiled by scientists, cost accountants, pricing specialists and others for the purpose of Fairchild's internal cost controls in developing a product to meet its obligations under the proposed executory contracts—evidence an intent that Fairchild be bound to an alleged oral agreement decidedly different from the contract proposal at hand.

It does not aid plaintiff to show that defendant used the words "commission to Merex" on its pricing sheets during development of the sale/resale agreement. The words "commission", "differential" or "mark-up" used to express plaintiff's expected compensation in the context of the

38. This Court examined *in camera* all of the offered Fairchild documents and did not find a single one which states Fairchild was to pay

negotiations is not proof of the oral promise plaintiff asserts. These words alone or in combination, even devoid of their context, do not satisfy as a matter of law the *Crabtree* standard in that they do not exemplify an entire contract with reasonable definitiveness and certainty sufficient to recompense Merex if Fairchild sold the camera systems directly to the PRC.

Plaintiff failed to prove a written contract to pay Merex a commission on a direct sale to the PRC under the standard of *Crabtree*. The written contract claim alleged in the First Claim was dismissed as a matter of law.

### IV.

#### Quantum Meruit

■ This Court also dismissed the second claim, which was based on quantum meruit. In so doing, the Court relied upon *Minichiello v. Royal Business Funds Corp.*, 18 N.Y.2d 521, 277 N.Y.S.2d 268, 223 N.E.2d 793 (1966), *cert. denied*, 389 U.S. 820, 88 S.Ct. 41, 19 L.Ed.2d 72 (1967), in which Judge Keating applied the Statute of Frauds to a business broker plaintiff who sought to recover commissions in quantum meruit. The plaintiff broker had no written evidence of his contract. The Court, in dismissing the claim, stated:

> [The purpose of the Statute of Frauds] is to make clear that the contracts required to be evidenced by writing include a contract or agreement for the compensation of a business broker for acting as a "finder", "originator" or "introducer," or for assisting in the negotiation or consummation of the transaction, and that the requirement cannot be avoided by an action for compensation in quantum meruit.

18 N.Y.2d at 525, 277 N.Y.S.2d at 270–71, 223 N.E.2d at 795 (citing N.Y.Legis.Doc., 1964, No. 65[F]).

Merex a commission on a direct sale to the PRC. Trial Tr. at 1613–1668.

## V.

### Promissory Estoppel

The plaintiff in the instant case requested the Court to charge the jury under the doctrine of *Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34 (2d Cir.1977), which establishes the possibility of, and requirements for, a claim of promissory estoppel.

In support of its claim of promissory estoppel plaintiff argued that it performed at all times pursuant to the oral commission promise of Neasham to Merex made in Germany in August of 1982. Plaintiff dismissed the significance of the contemporaneously made written evidence of its acceptance of Fairchild's counterproposal[39] by arguing that the sale/resale arrangement was only a mechanism to get the deal done and at no time was it accepted by plaintiff as a replacement of the underlying alleged oral promise.[40]

The Court charged the jury that in order to find for the plaintiff it must be convinced by a preponderance of the credible evidence that:

(1) a clear and unambiguous promise was made to plaintiff;

(2) plaintiff relied on the promise alleged;

(3) the performance of plaintiff was unequivocally referable to the promise alleged; and

(4) plaintiff sustained injury as a result of its reliance.

The Court further charged the jury that loss of profits was an insufficient injury to invoke the doctrine of equitable estoppel.

### i.

### A Clear and Unambiguous Promise

After so many pages of this opinion, it seems rhetorical to state again that the defendant in this case is Fairchild. The contract plaintiff alleged was an asserted oral agreement between G. Mertins on behalf of Merex and Neasham on behalf of Fairchild.

Because the promise here, if any, was made by Neasham, plaintiff must show not only that the promise was clear and unambiguous, but that Neasham had authority to bind Fairchild. Fairchild's liability can only be predicated upon one of three theories: *first*, that Fairchild actually authorized Neasham to make the oral contract; *second*, that Fairchild clothed Neasham with apparent authority to make the oral contract; or *third*, that after Fairchild became aware of the terms of the oral contract, it ratified the contract. The burden of proof is upon plaintiff.

### A. Actual Authority

The only direct evidence in this case as to Neasham's actual authority is Neasham's testimony that he informed G. Mertins that he had no authority to bind the company, and the testimony of Pighi and Lay that Neasham, as a sales representative, had no authority to make a contract for commissions.

G. Mertins testified he "asked Neasham what was his authority." Neasham replied that Fairchild is a generous company. When G. Mertins informed Neasham that his practice is to receive a ten percent commission, G. Mertins testified that Neasham agreed. "We confirmed our agreement with [sic] shake hand."[41] On the

---

**39.** (1) The October 6, 1982 letter of Mertins to Lay [Trial Exhibit "C"] accepting the arrangement discussed by the parties at Fairchild headquarters in September, 1982.

(2) The Merex document of January 1983 [Trial Exhibit "L"] stating:
> It is intended at present that Merex will submit this offer as Fairchild's representative to the Chinese on Merex paper. The prices of this contract are Fairchild ex-factory prices on which we will add our addition.

(3) The telex of Mr. Wennman, a Merex employee conducting the PRC negotiations for Merex, dated June 9, 1983 stating:

> [T]he contract will be back to back except for prices ...

(4) The uncontroverted testimony on both sides that the parties negotiated among themselves and with the PRC until April, 1984 pursuant to the terms of the Red Book/Blue Book proposals.

**40.** Trial Tr. at 1195–1225; *see also* Plaintiff's argument on summation.

**41.** Trial Tr. at 343.

record, this Court holds there is an absence of any proof, much less proof by a preponderance of the evidence, that Neasham had actual authority to bind Fairchild to an oral commission contract. *Rodriguez v. Western Union Tel. Co.*, 285 N.Y. 667, 34 N.E.2d 375 (1941).

## B. Apparent Authority

■ An agent has apparent authority to bind his principal to a contract with a third party when the third party relies on manifestations of the agent's authority induced by the principal. *Restatement (Second) of Agency* § 125, at 319.

■ The issue of the apparent authority of Neasham to bind Fairchild to the alleged oral contract does not require lengthy comment in light of the leading cases on this point by the New York Court of Appeals. In *Hallock v. New York*, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 513, 474 N.E.2d 1178, 1181 (1984), the Court stated:

> Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction. The agent cannot by his own acts imbue himself with apparent authority.

In *Ford v. Unity Hospital*, 32 N.Y.2d 464, 473, 346 N.Y.S.2d 238, 244, 299 N.E.2d 659, 664 (1973) (citations omitted), the Court stated:

> An agent's power to bind his principal is coextensive with the principal's grant of authority. One who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority.... [T]he existence of "apparent authority" depends upon a

factual showing that the third party relied upon the misrepresentations of the agent because of some misleading conduct on the part of the principal—not the agent.

This record is devoid of any fact showing that Merex relied upon any misrepresentation of Fairchild, the principal. Rather, the overwhelming evidence is to the contrary, as discussed *infra*.

## C. Ratification

"It is a well-established rule ... that the principal does not have a duty to perform, nor is he liable upon a contract which he has not actually or apparently authorized or ratified." 3 N.Y.Jur.2d *Agency* § 247, at 72 (1980) (citing *Mandeville v. Avery*, 124 N.Y. 376, 26 N.E. 951 (1891); *Acme Kalamein Door & Sash Co. v. Union Dime Sav. Bank*, 10 N.Y.S.2d 908 (N.Y.App.Term 1939); *Beals v. Allen*, 18 Johns. 363 (1820); Restatement (Second) of Agency § 182 (1958)).

■ A principal can become bound by unauthorized acts through ratification, and ratification can occur by silence. "[W]hen an act is done without authority, under an assumed agency, it is the duty of the principal to disavow and repudiate it in a reasonable time after information of the transaction if he would avoid responsibility thereof." 2 N.Y.Jur.2d *Agency* § 175, at 599 (1979) (citing *Merritt v. Bissell*, 155 N.Y. 396, 50 N.E. 280 (1898); *Harvey v. F.W. Dodge Corp.*, 169 Misc. 781, 8 N.Y.S.2d 935 (1938)).[42] The principal's duty, however, arises only when the principal has "knowledge of the act and opportunity to dissent or repudiate." *Id.* § 174, at 598.[43]

---

**42.** *See also* 3 Am.Jur.2d *Agency* § 197, at 700 (1986) ("[A] principal, after receiving information that an act has been done without actual or apparent authority by one purporting to act as his agent on his behalf, is not bound by that act under the law of agency unless he ratifies the act; but he may and must elect to repudiate or ratify such act promptly or at least within a reasonable time."); 3 C.J.S. *Agency* § 402, at 240 (1973) ("It is the right and duty of a principal promptly to repudiate the unauthorized acts of his agent which do not meet with his approval

and which he does not desire to approve."); 3 C.J.S. *Agency* § 70, at 657 (1972) ("Where one without authority purports to act on behalf of a principal, the principal ordinarily has an election either to repudiate or to ratify the unauthorized transaction.").

**43.** *See also* 3 C.J.S. *Agency* § 402, at 241 (1973) ("A principal must repudiate the unauthorized act of his agent within a reasonable time following knowledge of such acts ...").

■ The undisputed evidence shows that in September, 1982, Mr. G. Mertins and his assistants went to Fairchild's headquarters in Syosset, Long Island, and discussed a mutually appropriate business arrangement. Mr. G. Mertins met with Mr. Louis Pighi, Fairchild's president and Mr. Chris Lay, Fairchild's vice president.

Mr. G. Mertins testified that on his visit to Syosset in the autumn of 1982, he and Mr. Pighi discussed the sale/resale arrangement. Construed most favorably to G. Mertins, his testimony was that he told Mr. Pighi that the arrangement was impossible and that he, G. Mertins, rejected the distributor contract in favor of the alleged oral contract.[44] This testimony is incredible in light of G. Mertins' testimony on cross-examination.[45] The Court finds as a matter of fact that G. Mertins, during his visit to Syosset in the autumn of 1982, did not press any claim for proceeding on the basis of the alleged oral contract.

■ If G. Mertins believed the August, 1982 Neasham contract was binding upon the principal, Fairchild, he was under an affirmative duty to reject the Fairchild sale/resale proposal, not because he thought it was impossible, but because he believed he already had a binding agreement to receive a ten percent commission just for introducing Fairchild to the PRC market. A person who deals with an agent has a duty to determine the scope of the agent's authority, *Ford*, 32 N.Y.2d at 473, 346 N.Y.S.2d at 244, 299 N.E.2d at 664, while a principal's duty to ratify or renounce the act of his agent arises only when the principal has knowledge of the act and is given an opportunity to accept or repudiate it. 2 N.Y.Jur.2d *Agency* § 174, at 598. G. Mertins remained silent when presented with the opportunity to discover the scope of Neasham's authority—and thus the reliability of the representations Mertins claims to have relied upon. At the same time, G. Mertins did not present Fair-

child with the opportunity to adopt or ratify the alleged Neasham agreement, although if he had, Fairchild's pursuit of a sale/resale agreement would prevent this Court from finding ratification of the alleged oral commission agreement anyway. Plaintiff, not Fairchild, failed in his duties.

It is to be noted that at the time of the September, 1982 meeting at Fairchild headquarters, neither plaintiff nor defendant had performed any act or incurred any expense. Only after Merex sent its letter to Fairchild on October 6, 1982, accepting the Fairchild September proposal of a sale/resale, did G. Mertins, Lachmann and Neasham travel to the PRC on November 7, 1982. Neasham and Lachmann presented the technical details for the LORAP/MTRF System to the PRC representatives.

After a further meeting between G. Mertins and Fairchild executives at the Fairchild Headquarters in January, 1983, Merex summarized the agreement reached as follows:

> It is intended at present that Merex will submit this offer as Fairchild's representative to the Chinese on Merex paper. The prices of this contract are Fairchild ex-factory prices on which we will add our addition.

From the foregoing uncontroverted facts, even if one assumes the Neasham/G. Mertins oral agreement in August of 1982, the record supports a finding—not of ratification by Fairchild—but of a counteroffer by the principal Fairchild which was accepted by the plaintiff, creating a new and different relationship between the parties. Fairchild was not bound by any oral agreement alleged.

ii.

*Plaintiff's Acts Must Have Been in Reliance on the Oral Promise*

■ Plaintiff has failed to meet his burden of proving by a preponderance of credi-

---

**44.** Trial Tr. at 373–74.

**45.** Trial Tr. at 439–60. G. Mertins conceded the authenticity of numerous items of correspondence and memoranda, both before and after his meeting with Pighi, in which the dealings between the parties were discussed in terms of a sale/resale distributorship rather than a com-

mission on a direct sale. Based on this overwhelming unfavorable documentation and G. Mertins' demeanor as a witness, the Court finds that his testimony regarding the position he took in Syosset in the autumn of 1982 carries no credibility.

ble evidence that he *reasonably* relied upon the oral promise alleged to have been made by Neasham in Germany. *See City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 49 (2d Cir.1988) ("Yonkers officials were aware of the weakness of their position at the time they contracted, rendering reliance unreasonable."); *Wurmfeld Assocs., P.C. v. Harlem Interfaith Counseling Servs.,* 179 A.D.2d 502, 578 N.Y.S.2d 200, 201 ("[P]laintiffs' services could not have been performed in reasonable reliance ..."), *leave to appeal dismissed,* 79 N.Y.2d 1027, 584 N.Y.S.2d 439, 594 N.E.2d 933 (1992).

The alleged oral promise contradicts the terms of an admitted, subsequent, written executory agreement. The credible evidence—as opposed to plaintiff's unreliable, unsubstantiated and self-serving testimony—shows that any oral promise was superseded by the parties' later dealings. Indeed, plaintiff did not convincingly establish that the alleged oral agreement was ever discussed with Fairchild after the meeting with Neasham. Reasonable reliance cannot be based upon wishful thinking, yet nothing more is suggested by the credible evidence here; plaintiff may have preferred a percentage commission all along, but it went ahead with a deal structured in a wholly different manner.

### iii.
### *Plaintiff's Performance Must Be Unequivocally Referable to the Promise Alleged.*

██ Plaintiff has alleged reliance on an oral agreement between G. Mertins and Neasham in Germany in August, 1982.

This Court finds that when Neasham informed Fairchild of the discussions in Germany between G. Mertins and Neasham, Fairchild immediately invited G. Mertins to Long Island where Fairchild told G. Mertins that a sale/resale would be the only basis on which the project could go forward. That meeting took place in September, 1982. On October 6, 1982, Merex wrote Fairchild that Merex accepted the Long Island proposal.

This Court finds that G. Mertins' October 6, 1982 acceptance of Fairchild's Long Island proposal is evidence of the parties' mutual agreement in principle to negotiate a sale/resale to the PRC.

Pursuant to the agreement to negotiate, the record reveals that the parties undertook three relevant activities:

(1) Plaintiff and defendant began discussions of terms for the back-to-back sale/resale which were reduced to the writing known as the Blue Book, later the Red Book.

(2) Mertins and Fairchild representatives went to the PRC on November 7, 1982, to present the technical details of the LORAP system.

(3) Fairchild began preparations for the manufacture of the LORAP camera systems.

There is no dispute between the parties that they negotiated all of the terms in the Red Book and used it as the basis of the negotiations with the PRC. The Red Book expressed the mutual intent of the parties; however, it was never executed because the condition precedent—the Merex sale to the PRC—never took place.

Where, as in the instant case, plaintiff performs under an alleged oral contract and defendant offers proof of another agreement (the sale/resale proposal) to which plaintiff's acts are equally referable, the finder of fact must be convinced that plaintiff's performance was pursuant to the contract it alleges and not another.

In the instant case, plaintiff did not perform any substantive act until after G. Mertins sent the October 6, 1982 letter to Fairchild accepting the sale/resale proposal. It cannot on this record be said that the preponderance of evidence demonstrated reliance by plaintiff on the oral agreement. *Cunnison v. Richardson Greenshields Sec.,* 107 A.D.2d 50, 485 N.Y.S.2d 272, 276 (1985) ("If ... an act is equally consistent with an explanation having a basis in other than the alleged oral agreement, the part performance relied upon will not remove the agreement from the bar of the statute of frauds."); *see also American Bartenders School, Inc. v. 105 Madison Co.,* 59 N.Y.2d 716, 463 N.Y.S.2d 424, 450 N.E.2d

230 (1983) ("[T]he doctrine of part performance is inapplicable, inasmuch as the performance is not 'unequivocally referable' to the alleged oral agreement."); *Ripple's of Clearview, Inc. v. Le Havre Assocs.*, 88 A.D.2d 120, 452 N.Y.S.2d 447, 449, *appeal denied*, 57 N.Y.2d 609, 456 N.Y.S.2d 1026, 442 N.E.2d 1277 (1982).

This Court finds that overwhelming evidence that plaintiff intended to perform in reliance on the sale/resale proposal and not on the alleged oral agreement of August, 1982 is contained in a letter dated February 27, 1985, after plaintiff learned of the direct sale by defendant to the PRC. The letter was written by G. Mertins to Fairchild's parent corporation. It stated in pertinent part:

> Between Merex and Fairchild Weston Systems Inc. it was agreed to that Merex would buy five photographic systems from Fairchild Weston for resale to NORINCO ... the three companies going through two contracts instead of one. The business relations between Fairchild Weston Systems, Inc. and Merex were established in a distributorship agreement in which Fairchild Weston Systems Inc. appointed Merex as its exclusive distributorship in the People's Republic of China.[46]

Plaintiff's argument that it accepted the sale/resale proposal as a mechanism to get the deal done and not as a substitute for the oral agreement is belied by the record evidence. This Court finds that plaintiff's performance was unequivocally referable to the sale/resale proposal under which plaintiff was to receive a commission by a markup of Fairchild's ex-factory price. Plaintiff has failed to prove that its performance was unequivocally referable to the oral commission agreement alleged.

### iv.
### *Injury*
Is This Case a Rare Exception?

 Before imposing liability by finding an equitable estoppel, courts look for a high degree of unconscionable behavior on the part of the defendant which makes invocation of the Statute of Frauds itself a fraud. *Philo Smith*, 554 F.2d at 36; *see also American Bartenders*, 59 N.Y.2d 716, 463 N.Y.S.2d 424, 450 N.E.2d 230 ("The purpose of invoking the doctrine [of equitable estoppel] is to prevent the infliction of unconscionable injury and loss upon one who has relied on the promise of another."); *Buddman Distribs., Inc. v. Labatt Importers, Inc.*, 91 A.D.2d 838, 458 N.Y.S.2d 395, 396–97 (N.Y.App.Div.1982) (citation omitted) ("The doctrine of promissory estoppel ... is 'properly reserved for that limited class of cases where 'the circumstances are such as to render it *unconscionable* to deny' the promise upon which the plaintiff has relied.' "). The focus of the court therefore is the conduct of the defendant rather than the loss to the plaintiff.

Plaintiff's claim was that Fairchild acted with fraudulent intent in insisting on the sale/resale format—which plaintiff claimed Fairchild knew the PRC would not accept—in order to take advantage of G. Mertins' contacts with that country. Plaintiff further argued that during the negotiations of the technical aspects of the Red Book proposal, Fairchild schemed with the PRC to "cut plaintiff out of the deal"[47] and to make a direct sale to the PRC.

The Court finds that the credible evidence in the record simply does not support this version of the facts.

Both plaintiff and defendant testified that their understanding was that both were to be present during negotiations with the PRC. For reasons never explained, G. Mertins did not go to the PRC as he agreed to do when he knew Chris Lay was negotiating the technical aspects of the Red Book proposal. Instead, G. Mertins sent an employee, Helmut Bucholz. When the technical discussions were nearing conclusion, Mr. Lay made repeated efforts by telexes to secure the presence of Mr. G. Mertins for the commercial negotiations. This series of telexes has been quot-

---

**46.** Letter is annexed to Plaintiff's amended complaint as Exhibit 23.

**47.** *See* Plaintiff's argument on summation.

ed earlier in this opinion,[48] but the telex of March 24, 1984, from Lay to Mertins bears repeating:

I had a meeting with Mr. Zhao Fei this morning. Tomorrow he wants to have technical meeting about pod modification.... Mr. Zhao Fei spoke to me directly on the commercial part and he indicated strongly that he desires your presence here for the commercial discussions. Would appreciate you trying to get over here as fast as possible.

Mr. Lay credibly testified to his reaction to the failure of G. Mertins to come to the PRC:

Mr. Bucholz [an employee of Merex] came to me and informed me that Mr. Helmut Mertins was coming to China, and my reaction to Mr. Bucholz was: I am very disappointed. We need Mr. G.G. Mertins in China, and there's no way that young Mr. Helmut Mertins is going to be able to handle the problem we are in right now. It is Mr. G. Mertins that has the rapport, and I was very upset with the message I had received, and I told him he could pass that information back to Merex, and he could possibly save Helmut a trip. And he informed me that Helmut was really coming on some other business also.

The Court finds, based on the evidence in the record, that Fairchild, rather than engaging in an unconscionable or fraudulent scheme with the PRC to "cut plaintiff out of the deal," endeavored in good faith to secure the presence of G. Mertins in the PRC to negotiate the commercial aspects of the proposal. Fairchild bargained for the negotiating services of the elder, knowledgeable, and business wise Mertins, not his twenty-five year old son.

Plaintiff has not proven by a preponderance of the credible evidence that the negotiations collapsed in April, 1984 due to any wrongdoing on the part of Fairchild. Plaintiff has not proven the most essential factor of *Philo Smith*, unconscionable conduct on the part of the defendant which caused him injury.

This Circuit held in *Philo Smith*, 554 F.2d at 36:

The proof in this case fell well short of that mark. Judge Tenney found that the only substantial injury suffered by the plaintiffs was the loss of a fee from the defendant. However, as Judge Tenney held, and as the quotation from Woolley indicates, this is not the kind of injury contemplated by New York law, for it is solely a result of the non-performance of a void agreement.

In the instant case, there has been no proof of damages other than loss of a fee. This Court charged the jury that such loss was insufficient to invoke the doctrine of promissory estoppel.

This Court has not overlooked the case of *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir.1989). Mr. G. Mertins absented himself from the negotiations in China, which were a critical part of his responsibility, and Fairchild, by telexes, made him aware of the urgency of his appearance. This Court does not find the defendant negotiated in bad faith; on the contrary, the Court finds plaintiff breached its own negotiating responsibilities.

Although this Court cannot say with a reasonable degree of certainty whether the presence of G. Mertins at the bargaining table would have caused a successful conclusion to the contract negotiations, it can certainly say that his absence constituted a failure to negotiate in good faith on his part, and defendant had an absolute right to rescind its agreement with Merex because of the material breach of that agreement by Mr. G. Mertins. This Court therefore finds that Merex, rather than Fairchild, materially breached the agreement to negotiate in good faith for the sale/resale of the LORAP systems to the PRC. This Court finds that plaintiff has not proven its claim of promissory estoppel by a fair preponderance of the credible evidence and renders a verdict for the defendant on this claim.

---

**48.** *See supra* pp. 1362–1363.

Submit Order.

IT IS SO ORDERED.