**C.E. TOWERS CO., Plaintiff,**

**v.**

**TRINIDAD AND TOBAGO (BWIA IN- TERNATIONAL) AIRWAYS CORPO- RATION, d/b/a BWIA International, De- fendant.**

**No. 93 Civ. 0922 (BN).**

United States District Court,
S.D. New York.

Oct. 12, 1995.

Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, Charlotte M. Fischman, Geoffrey Potter, of counsel, for plaintiff.

Kirschenbaum & Kirschenbaum, P.C., Garden City, NY, Samuel Kirschenbaum, Ira Levine, of counsel, for defendant.

### OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

NEWMAN, Senior District Judge:[1]

C.E. Towers Co. (hereinafter "Towers"), a general partnership and owner of a seventeen story building located in Forrest Hills, brings this diversity action against Trinidad and Tobago (BWIA International) Airways Corp. (hereinafter "BWIA"), a company involved in the airline industry. Towers seeks $1,276,562.78 in damages for its claim that BWIA breached a lease it had entered into with Towers. BWIA asks that the complaint be dismissed; and each party seeks attorney fees.

This matter arises under the court's diversity jurisdiction, in conformity with 28 U.S.C. § 1332(a), and the case was tried to the court in a two day bench trial. Pursuant to F.R.C.P. Rule 52(a), the following constitutes the court's findings of fact and conclusions of law.

### THE RECORD

In its direct case, Towers presented two witnesses: Stanley Markowitz, senior vice-president of Towers and Shilla Patel, in charge of accounts receivable. BWIA presented two witnesses: Timothy Cook, Senior Vice President of General Marketing in North America and Chandra Baldeo, a former secretary for BWIA. Testifying for Towers in its rebuttal case were John Busch, director of management; Harold Reichert, superintendent at the Towers building; John Bolen, in charge of commercial leasing; and Terry Getchell, who was a receptionist in 1993 for Towers. In addition, pursuant to F.R.C.P. Rule 32(a)(3)(E), the depositions of Keith Chong, former director of finance for BWIA, Horace Blake, former senior vice-president in charge of North America, and Bert Rivero, former director of sales and operations for Northern USA, were admitted into evidence with the consent of both parties.[2] The parties moved 147 exhibits into evidence.

### CONTENTIONS OF THE PARTIES

Towers contends that BWIA's abandonment of the premises and failure to pay rent since October 1992 breaches the lease it signed with BWIA in 1982. In its favor, Towers points to the 1982 lease entered into with BWIA and subsequent "lease extension" which was signed in August 1987, providing that Towers would lease office space in its building to BWIA for the agreed upon rent until August 31, 1997. Towers maintains that it was notified by BWIA in July 1992 that BWIA was terminating the agreement and leaving the building by October 10, 1992. Despite the repeated insistence by Towers that BWIA honor the agreement, on October 10, 1992 BWIA employees left the office, taking the furniture and disconnecting the phone. Accordingly, Towers asserts that it is entitled to recover the outstanding rent, reimbursement for out-of-pocket expenses to re-let the building, and attorneys' fees.

BWIA responds that Towers orally agreed to excuse the leasehold obligations in exchange for $150,000, which BWIA offered to pay Towers, but was refused. Moreover, BWIA argues that the lease extension which Towers relies upon, cannot be enforced because the individual who signed the lease, purportedly on behalf of BWIA, did not have the authority to do so. Additionally, BWIA alleges that because on October 23, 1992 Towers changed the locks to the offices, BWIA was evicted and under New York law, does not have any further rent obligations to Towers. Finally, in addition to seeking its own attorney's fees, BWIA argues that the figure submitted by Towers for their attorneys' fees is unreasonable.

### FINDINGS OF FACT

Towers, a New York general partnership controlled by the Muss family, owns a seventeen-story building situated at 118–35 Forest

---

1. Bernard Newman, Senior Judge of the United States Court of International Trade, sitting as United States District Judge by designation.

2. Each of these individuals was unavailable to testify at trial.

Hills, New York, and is located in a highly traveled commercial area. The partnership owns several properties and is in the business of leasing commercial office space. Towers' managing partner is Joshua Muss.

BWIA is a business incorporated under the laws of the Republic of Trinidad and Tobago. Since 1964, BWIA has been authorized to do business in the state of New York. BWIA operates international air transport services in several countries including the United States.

Towers and BWIA entered into the lease agreement on June 2, 1982 as landlord and tenant, respectively. The five year lease, expiring on August 31, 1987, provided that BWIA would occupy the seventeenth floor of the Forest Hills building as its North American headquarters. Subsequently, the lease was modified on two occasions: in September 1983, BWIA gave up some of the space it had rented, and in October 1983 the notice provisions of the lease were amended in favor of the mortgagee of the premises. Each modification was made in writing and signed on behalf of BWIA by Keith Chong and Peter Lookhong, the manager in charge of North American Operations.

From January to July 1987, Towers and BWIA negotiated to extend the lease. The following individuals negotiated the extension on behalf of BWIA: Horace Blake, vice-president of North American Operations; Thomas J. Hill, Regional Manager of North Eastern United States; Keith Chong and Peter Lookhong. A written agreement extending the lease effective September 1, 1987 was executed on August 11, 1987. The extension was signed by Joshua Muss, representing Towers and sent to BWIA, who returned two copies of the extension bearing the signature of Blake, Vice–President in charge of North American Operations dated August 11, 1987. Thereafter, on August 24, 1987 Towers sent the fully signed lease extension to BWIA.

The extension was to run for a ten year term expiring on August 31, 1994 and consisted of a two page document incorporating the terms, conditions and covenants of the original lease dated June 2, 1982. Further, the extension modified the duration and rent-al obligations. Specifically, in addition to extending the lease ten years beyond its original termination date, the extension set forth the base rents, schedule of additional rents, and money due for submetered electric service to the premise. From September 1, 1987 until October 31, 1992, BWIA was normally billed and without incident paid the rent to Towers. On May 30, 1990, a tenant Estoppel Certificate signed by Horace Blake was filed with the New York State Comptroller stating that the lease and the extension were in full force.

In September 1991, BWIA considered relocating its New York offices to Florida for business and economic reasons. Moreover in September 1991, representatives of BWIA began to discuss with Towers the feasibility of extricating itself from the lease. Several representatives of BWIA including Chong, Lewis, and Cook met with Stanley Markowitz, senior vice-president at Towers. Markowitz' responsibilities included "the planning, marketing, negotiating and leasing of commercial office space, rental space, and industrial space" (R. 29). The parties agree that talks took place between Markowitz and BWIA concerning such matters as cost reduction and release from the lease. Several ideas were discussed, including the possibility of BWIA subletting the space, moving to another building owned by Towers, and buying out the lease.

BWIA maintains that in several meetings beginning in November 1991, Cook and Chong were told by Markowitz "that it would be $150,000 if we [BWIA] broke the lease" (R. 141). Cook and Chong both state that Markowitz unequivocally and repeatedly said that $150,000 would be the price to "break the lease" (R. 141; Exh. 95 p. 43). Beyond the testimony of the two individuals, BWIA offered the following note written by Markowitz stating:

> Here is the present balance difference between the BWIA lease and a new market rate lease for the same space (not including any fix-up work or any brokerage commission) $150,000.

(Exh. 23). BWIA finally contends that these discussion culminated in a June 2, 1992 meet-

ing when Markowitz once again stated that the lease could be broken for $150,000. (R. 180; Exh. 43). BWIA maintains that this representation by Markowitz was an oral agreement between the parties which it relied upon when it signed the Florida lease.

Towers flatly denies that any oral agreement was ever made. Testifying for Towers, Markowitz stated that he had general discussions with representatives from BWIA including Cook and Chong. Among the topics discussed were rent reduction, the ability of BWIA to find a subtenant, relocation, and the difference between the present value of the lease and another market rate lease which came to approximately $150,000 (R. 40). Explaining that these meetings were informal and many different scenarios were discussed, Markowitz testified he never agreed that BWIA could be excused from the lease for $150,000 (R. 94). Significantly, he stated that although BWIA representatives had on several occasions asked for a writing documenting that the lease would be excused for $150,000, he had repeatedly told the representatives that he "was not authorized to provide such a writing, and that there was no such agreement that if they [BWIA] paid $150,000 or thereabouts that they would be released form their obligations of the lease" (R.54).

■ Resolving this factual dispute, the court credits the testimony of Markowitz and finds that no oral agreement existed. In addition to finding Markowitz forthright and credible, the court looks to several other factors which support its conclusion. While it is clear that a figure approximating $150,-000 was brought up in the discussion between Towers and BWIA, the evidence simply does not support BWIA's claim that there was a concrete agreement between the two parties. Markowitz' handwritten note regarding one of the meetings indicates that the $150,000 was the difference between rent BWIA was paying and the approximate amount of money for which the same offices could be leased, rather than a buy-out price for BWIA (Exh. 23).

An undisputed factor that weighs in favor of Towers is its refusal to give BWIA written confirmation of the alleged agreement. Certainly if Towers had agreed to the terms as BWIA claims, there would be no reason why Towers would not reduce the agreement to writing. The evidence is clear that despite repeated requests by BWIA to Towers for a writing, none was ever forthcoming. Towers insists that the reason it refused to provide any writing was simply because it had made no such agreement. The short of the matter is: considering that all other modifications of the lease were made in writing, the only logical conclusion as to why Towers never agreed to a writing was that it never agreed to the terms put forth by BWIA.

Closer scrutiny of BWIA's allegations exposes even further problems with its story. Cook, who was one of the principals to whom this oral agreement was allegedly made, testified that on June 2, 1992, there was a final meeting with Markowitz, where he asserts Markowitz again agreed that BWIA could "break the lease" for $150,000 (R. 179–81). Indeed, in a memo from Cook to file, he wrote:

On June 2nd, Keith Chong and I had a final meeting with Mr. Markowitz one more time *before we had to sign the lease* for the Doral property in Miami, just to make sure that $150,000 was the correct number. Again, Mr. Markowitz at that meeting said what he said all along, that he thought he would be able to get some space for the Sales Office, and the number was going to be $150,000 or lower if we were able to rent the space. Based on all these assurances, we signed the lease for the Doral building in Miami.

(Exh. 43) (emphasis added). At trial, Cook directly contradicts this memo by admitting that the Florida lease was signed on May 21, 1992, almost two weeks *before* the meeting (R. 181–82). Logic dictates that if there was a firm agreement between the two parties, such agreement would have been finalized before the second lease was signed by BWIA. By Cook's own admissions at trial, BWIA signed the Florida lease before the final meeting with Towers. The court, therefore, finds further support for its conclusion that no agreement existed between the parties.

The court also determines that the testimony of Cook, who is the main witness presented by BWIA to support its claim that there was an oral agreement, is incredible. Initially, Cook admits that he did not have any experience in either the real estate or legal field when he was hired by BWIA (R. 153). Moreover, Cook admitted to being discharged because he thought "the company lost faith" in his abilities (R. 189). Cook was criticized for a number of incidents he was involved in. Not only did such dissatisfaction result from the way this matter was handled, but BWIA made other allegations regarding Cook's deficient performance. The complaints included improper leasing of computer equipment, improper purchase of office equipment, and mismanagement in hiring staff exceeding the budget (R. 190). Essentially, the court is of the opinion that Cook admittedly did not have any expertise in this field, and while he may very well believe that there was an agreement, his mere belief is simply not enough. In light of all the testimony, exhibits, and Cook's history of his alleged mismanagement, the court finds that the evidence is insufficient to support BWIA's claim that there was an oral agreement allowing it to "break the lease."

By letter dated July 13, 1992, BWIA advised Towers that it was vacating the building on October 1, 1992. Towers responded by letter dated August 3, 1992 stating that although it would continue discussions with BWIA, "until some further written agreement is executed and delivered by both Landlord and Tenant," BWIA was to "faithfully observe all of the obligations of its lease agreement with Towers" (Exh. 32). While the parties continued to correspond, Towers continued to demand that BWIA abide by the provisions of the lease until such time as another agreement was reached.

On October 2, 1992 an initial group of BWIA employees vacated the premises. The remainder of the employees left on October 10, 1992, at which point BWIA also removed its furniture and disconnected the phone lines. No keys were returned by BWIA to Towers. BWIA tendered a check for $150,-000 to Towers on October 26, 1992 which was refused. In mid-November, Markowitz on behalf of Towers wrote to BWIA stating in pertinent part:

> We therefore advise you that your rental and other lease obligations continue unchanged, which of itself constitutes a further breach of the lease, and that your rent for the month of November, as previously billed, is now past due. Demand for payment of such rent is hereby made.

(Exh. 39). Although Towers continued to send regular bills to BWIA for rent due, BWIA never remitted any additional payment.

After BWIA had left the premises, Towers had the locks changed on all of the doors with the exception of the back door (R. 256, 261–62). John Busch, Towers' director of management, testified that the reason for the lock change was a security policy because of a previous incident where a woman after being forced into a vacant office was raped (R. 249). Busch further explained that he left instructions that if any BWIA representatives requested access to the building, such representatives should be allowed to enter the offices (R. 250). Additionally, Busch told Harold Reichert, a superintendent in the Forest Hills building, that "should anybody from BWIA contact him, that he should refer them to me." (R. 251).

On February 23, 1993, at the request of Cook, Reichert was contacted by Chandra Baldeo, a secretary for BWIA (R. 215, 218). Reichert explained that the locks were changed and that he, Reichert, would have to obtain approval from Mr. Busch to let Baldeo in the offices (R. 215). While Baldeo knew who Busch was, she did not seek to contact him at any future time regarding keys (R. 222). Baldeo, with Errol Millington an employee of BWIA who retained his keys, went back to the building on March 16, 1993. Although the two did not contact anybody, they went to the seventeenth floor and could not gain access (R. 229–231). Baldeo did not contact anyone other than Reichert or try the back door.

Another factual dispute arises regarding whether a representative from BWIA received a key to the new locks. Towers contends that somewhere in March or April 1983, Busch gave instructions to Reichert to

provide keys to John Bolen, in charge of commercial construction for Towers, who was going to make sure the necessary keys were left at the reception desk to be obtained by BWIA (R. 253). Bolen received the keys and gave them to his secretary instructing her to give the keys to any representative of BWIA who asked for them, and then issue a receipt (R. 270). Terry Getchell, a receptionist for Towers, testified that although she could not remember the person, she gave to someone who appeared to her to be an employee of BWIA, keys to the offices and received a receipt that met Getchell's satisfaction (R. 281–83).

BWIA argues that none of its representatives ever received a key from Towers. Indeed, BWIA urges that because Getchell could not remember the person to whom she gave the key, or that Towers could not produce the receipt, the court should find Getchell's testimony incredible (Defendant's post trial brief, pp. 19–20). The court declines to do so, and determines that the keys were turned over by Getchell to an individual who appeared to be an employee of BWIA. The following factors support this finding.

Initially, the court was able to observe the testimony and demeanor of the witness, and believes Getchell to be credible. Moreover, the testimony of Busch was consistent with that of Reichert regarding the approved policy for providing the keys to the new locks. Additionally, the stipulation between the parties regarding entrance to the building, weighs in favor of Towers. The attorneys stipulated:

> [I]f we [BWIA] had wanted to go in and called Mr. Korotkin, he would make arrangement to assist BWIA or any representative of BWIA to get into the premises that Mr. Korotkin would have done that. I will stipulate.

(R. 303). Based on that stipulation, the evidence definitively shows that the locks securing the offices were not changed with the intent to deprive BWIA of access. Taking the stipulation into account, corroborated by Muss' reasons for changing the locks, the fact that the rear door had the original lock to which BWIA still had keys, and the testimony of Getchell, the court finds that Towers did not intend to keep BWIA out of the building; and that the evidence supports Towers' claim that an apparent representative from BWIA obtained keys to the new locks from Getchell.

Towers continued to send monthly invoices which were not paid by BWIA. New tenants signed a lease to begin paying rent for the premises starting on July 1, 1995. In an effort to attract the tenants, Towers maintains that it was required to alter the space, and consequently seeks from BWIA, in addition to back rent and attorney fees, and the expenses for the renovations.

## DISCUSSION

By the terms of the lease, this case is governed by New York law. Since the court finds that there was no oral agreement between the parties to release BWIA from the lease in exchange for $150,000, there is no occasion to address whether such an oral provision could be enforced. There does remain, however, two legal defenses raised by BWIA which, it contends, releases BWIA from any obligations to Towers. Specifically, BWIA alleges that Blake, the Vice–President in charge of North American Operations, did not have the authority to sign the lease extension. Accordingly, BWIA reasons that the extension is therefore unenforceable. Second, BWIA argues that not withstanding the validity of the lease extension, Towers' act of changing the office locks constitutes an eviction which would relieve BWIA of any obligation to pay rent. For the following reasons, the court finds both claims by BWIA to be meritless.

### A.

BWIA maintains that Blake, its senior vice-president in charge of North America did not have authority to enter into the lease agreement. Continuing, BWIA relies on a policy manual, which provides that only its board of directors, the Chairman of the Board, or its Managing Director are authorized to enter into a leasehold agreement. Towers responds that Blake had actual authority to enter into the agreement, that even if such authority was lacking it relied on Blake's apparent authority, and finally even

if there was no authority whatsoever, BWIA ratified the agreement through its performance for several years.

 Under New York law, an agent's authority may be actual or apparent. The court credits Towers' claim that Blake had actual or at least implied authority to bind BWIA to the lease extension. "Actual authority is the result of the principal's consent manifested to the agent". *Oriental Commercial & Shipping v. Rosseel N.V.*, 702 F.Supp. 1005, 1014 (S.D.N.Y.1988), *quoting, Wen Kroy Realty Co. v. Public National Bank & Trust Co.*, 260 N.Y. 84, 91, 183 N.E. 73 (1932). An agent may be expressly given power to act on behalf of a principal or the authority may be implied. An agent enjoys implied authority to enter into a transaction when the principal by its acts reasonably gives the appearance of authority to the agent. *Greene v. Hellman*, 51 N.Y.2d 197, 204, 433 N.Y.S.2d 75, 80, 412 N.E.2d 1301, 1306 (1980); *see King World Productions v. Financial News Network, Inc.*, 660 F.Supp. 1381, 1384 (S.D.N.Y.1987) *aff'd*, 834 F.2d 267 (2d Cir.1988) ("an agent employed to do an act is deemed authorized to do it in the manner which business entrusted to him is usually done."). Obviously, if a principal empowers its agent either expressly or impliedly to act, that principal is bound by the agent's actions.

Here, there exists ample evidence demonstrating that Blake had actual or at the very least implied authority to bind BWIA into the lease extension. In his deposition, Blake specifically stated that he had authority to bind BWIA to the extension saying that:

> it's inconceivable that I could sign any lease for BWIA without authority from as high up as the managing director. Those things are discussed at length because you're talking about a lot of money so not only that, every lease, I don't care what it was, I had to discuss it with head office and immediately after it had to be on an aircraft, otherwise somebody would be jumping all over you down to the head office. Plus we go though like any company a budget process and during that budget process, again repeat that the company is losing money pretty tight on your dol-

lars, and as I recall the president or managing director of the company went in detail on that budget. For one to suggest that I signed something without authority had to be crazy.

(Exh. 94, at 9–10). Significantly too, Blake recalled that this particular lease extension had been discussed by him with both the President of BWIA and the Corporate Manager.

 Beyond the direct evidence that Blake had actual authority from BWIA to sign the lease extension, additional evidence corroborates Blake's testimony. Blake, as vice-president in charge of North American Operations, was one of the chief negotiators who crafted the lease extension. Indeed, it is not a wild stretch of the imagination to believe the person who was in charge of North American Operations would be authorized to sign a lease extension relating to the North American headquarters, which he negotiated. Moreover, Towers sent the lease extension for signature to BWIA without any specification as to who it wanted to be the signatory. Along with a letter dated August 11, 1987, BWIA returned the lease extension signed by Blake. The decision to have Blake sign for BWIA was made by BWIA. Towers should be able to rely on the decision made by BWIA to bind BWIA. Viewed in conjunction with Blake's deposition, all of the surrounding circumstances indicate that he was empowered by BWIA to bind it to the lease extension.

 Even if the court accepted BWIA's proposition that Blake was not actually empowered to enter into the lease extension, the evidence still warrants a finding for Towers under the doctrine of apparent authority. Apparent authority bars a principal from disavowing the transactions of its agent. The New York State Court of Appeals has explained when this doctrine is appropriate:

> [T]he existence of "apparent authority" depends on the factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal—not the agent.

*Ford v. Unity Hospital*, 32 N.Y.2d 464, 472–73, 346 N.Y.S.2d 238, 244, 299 N.E.2d 659, 664 (1973); *see also, Fennell v. TLB Kent Co.*, 865 F.2d 498, 503 (2d Cir.1989); *Chelsea National Bank v. Lincoln Plaza Towers Assoc.*, 93 A.D.2d 216, 219, 461 N.Y.S.2d 328, 331 (1st Dept.1983), *aff'd*, 61 N.Y.2d 817, 473 N.Y.S.2d 953, 462 N.E.2d 130 (1984). It must also be established that the third party reasonably relied on the representations put forth. *Hallock v. State*, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 513, 474 N.E.2d 1178 (1984). The determination of reasonable reliance is:

> essentially a question of fact. It depends not only on the nature of the contract involved, but the officers negotiating it, the corporation's usual manner of conducting business, the size of the corporation and the number of its stockholders, the circumstances that give rise to the contract, the reasonableness of the contract, the amounts involved, and who the contracting third party is, to list a few but not all of the relevant factors.

*Utica Mut. Ins. Co. v. Fireman's Fund Ins.*, 613 F.Supp. 1134, 1138 (S.D.N.Y.1985), *quoting, Lee v. Jenkins Brothers*, 268 F.2d 357, 365 (2d Cir.), *cert. denied*, 361 U.S. 913, 80 S.Ct. 257, 4 L.Ed.2d 183 (1959).

The evidence in this case demonstrates that Towers understandably believed that Blake had the proper authority. The appearance such authority stemmed from the actions both of Blake and BWIA itself. Put simply, Blake was the man BWIA chose to negotiate the lease; BWIA gave Blake the title of Vice–President North America; and Blake's subordinates, other employees of BWIA, furnished him, as well as the corporate manager in Trinidad, with written reports (Exh. 15–16). Finally, when the extension was drafted, Towers sent a copy to BWIA, not specifically to Blake. Yet, when the lease extension was returned, it was signed by Blake. Thus, it was BWIA, not Towers who made the decision who would negotiate and who would sign the extension. Considering all of the circumstances, the court finds that Towers relied on both BWIA's conduct as well as the actions of Blake, and that such reliance was reasonable.

BWIA asserts that the doctrine of apparent authority is not available to Towers because it did not make a reasonable investigation into the scope of Blake's authority. Specifically, it contends that the failure of Towers to ferret out BWIA's 1984 Policy on Financial Authority, demonstrates that Towers did not engage in a reasonable investigation regarding Blake's authority. The policy manual provides that the authority to negotiate and execute leases of buildings was limited to:

a) the Board of Directors of Trinidad and Tobago (BWIA International) Airways Corporation;

b) its Chairman of the Board; and

c) its Managing Director

(Exh. 11). The court finds BWIA's argument is unconvincing.

Contrary to BWIA's claims, under the circumstances in this case, Towers was under no duty inquire any further than it did as to Blake's authority. In the apparent authority context, the duty to additionally inquire arises when the situation creates circumstances which would lead a reasonable third party to believe that investigation would be necessary. *Herbert Constr. Co. v. Continental Ins. Co.*, 931 F.2d 989, 995–96 (2d Cir.1991). In other words, it is only when the transaction is extraordinary or so novel that it should alert the third party to the danger of fraud, that there is an additional duty to inquire into the agent's authority. *See e.g., Collision Plan Unlimited Inc. v. Bankers Trust Co.*, 63 N.Y.2d 827, 830, 482 N.Y.S.2d 252, 253, 472 N.E.2d 28, 29 (1984) (the court explained that "the mortgage arrangement should have triggered the duty of reasonable inquiry since a gratuitous guarantee by a corporation of a debt of an unrelated corporation is extraordinary"); *Whitney v. Citibank N.A.*, 782 F.2d 1106, 1115–1116 (2d Cir.1986) (absent awareness of facts indicating that an agent is acting beyond his real or apparent authority, a third party is not obligated to investigate the matter further or search for some limitation on that partner's authority); *General Overseas Films Ltd. v. Robin Int'L Inc.*, 542 F.Supp. 684, 696 (S.D.N.Y.1982), *aff'd*, 718 F.2d 1085 (2d Cir. 1983).

■ When analyzing New York State law regarding apparent authority, the Second Circuit found that unless the circumstances were unusual, thereby putting the third party on notice to further inquire, New York law does not require investigation beyond reliance on the action of the principal and agent. *Herbert Cons. Co.*, 931 F.2d at 996. In explaining why it came to this conclusion, the Second Circuit noted:

> Were this not the rule, such a duty of inquiry would nullify the doctrine of apparent authority in almost every case. Instead, the duty of inquiry amounts to an alternative way of asking whether the third party reasonably relied on the representations of the agent that he possessed authority to bind the principal.

*Id.*

In point of fact, this analysis is consistent with the very law relied upon by BWIA. Accurately quoting from the New York State Court of Appeals, BWIA states, "[o]ne who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority" (Defendant's Post–Trial Brief, p. 29, *quoting, Ford,* 32 N.Y.2d at 472–473, 346 N.Y.S.2d at 243–245, 299 N.E.2d at 663–664). However, the court went on to say that "upon failure to properly determine the scope of authority" you then consider the doctrine of apparent authority. *Ford,* 32 N.Y.2d at 472–473, 346 N.Y.S.2d at 243–245, 299 N.E.2d at 663–664. The clear implication is that in *Ford,* the court when discussing inquiries, was addressing an actual authority question. *See, Herbert Cost. Co.,* 931 F.2d at 995.

Even if Towers had engaged in the investigation BWIA suggests, there is very little chance that Towers would *ever* have found the policy statement, no matter how extensive its inquiry was. Initially, Blake stated that he was specifically authorized to enter into the agreement. Thus, it is clear from his deposition that he was unaware of the limitation of his authority claimed by Towers. Chong's deposition said that there were no copies of the policy maintained in the New York office, that it was not discussed with any BWIA people working in New York, and that he did not ever have any occasion to use the guidelines (Exh. 95, pp. 95–96). Cook, who replaced Blake as head of BWIA's North American Operations, testified that until this case was filed, he had never seen this purported policy and opined that the New York office did not even have a copy of it (R. 191–92). Nor was there any evidence that the policy was ever used by BWIA. In fact, two other leases that were admitted into evidence in order to show BWIA's practice were signed by Blake or the person previously in Blake's position. The two other leases make it abundantly clear that BWIA did not generally follow the policy upon which it now attempts to rely. Accordingly, no matter how extensive an inquiry Towers might have made, there is no way that one could have ascertained the policy.

Even the suggestion put forward by BWIA as to where Towers could have searched would not likely have been fruitful. BWIA argues that Towers could have looked into the cooperate documents on file with the Clerk of New York County (Defendant's Post–Trial Brief, p. 32). BWIA concludes that "[h]ad the plaintiff made any examination of the records maintained by the County clerk of New York County, or the New York Secretary of State … the plaintiff would have discovered that the corporation was organized under the laws of a foreign country, the Republic of Trinidad and Tobago" (Defendant's Post Trial Brief, p. 35). BWIA never makes clear how the filed information would relate to discovering the finance policy. And BWIA does not claim that the policy itself, nor any relating documents, were on file. Accordingly, such an inquiry would have been of no help to Towers in finding the policy that BWIA's New York office was unaware of and never followed.

■ Secret limitations of power cannot be expected to be found by even the most diligent third parties. Here, it is clear from the evidence that even high level employees of BWIA in North America did not have copies of the policy. Certainly, there is no suggestion that the policy was ever followed. It appears that the North American employees did not even realize that such limitations existed. Under those circumstances, it is ridiculous to suggest that Towers had an

obligation to find the policy, when BWIA's very employees could not do so.

■ Additionally, it cannot be claimed that the nature of this agreement created a heightened duty on the part of Towers to investigate Blake's authority. The lease extension was for a ten year term and consisted of a two page document incorporating the terms, conditions and covenants of the original lease, simply modifying its duration and rental obligations (Exh. 19). All of the main terms had already been negotiated at the inception of the original lease. It is only when a principal is to be bound into a transaction of an extraordinary nature that a heightened investigation must take place. *Herbert Cons. Co.*, 931 F.2d at 995; *see also, Jenkins Brothers*, 268 F.2d at 365; *Utica Mut. Ins. Co.*, 613 F.Supp. at 1138; *General Overseas Films, Ltd. v. Robin International, Inc.*, 542 F.Supp 684, 690 (S.D.N.Y.1982), *aff'd mem.*, 718 F.2d 1085 (2d Cir.1983). There is nothing to suggest that the lease extension constituted an extraordinary agreement, Towers' actions, by sending the extension to BWIA and relying on the signature that appeared on the document returned by BWIA five weeks later, was reasonable. Towers certainly had every reason to believe and rely on the appearance that Blake did in fact have such authority.

■ Finally, the court looks to the evidence of BWIA's industry practice regarding leases in order to determine if the reliance by Towers was reasonable. Regarding the two other leases admitted into evidence, either Blake or the person holding his title, signed on behalf of BWIA (Exh. 14, 20). Hence, it is plain that the practice of BWIA was to have the person in Blake's position sign the leases. After considering all of the evidence put forward that is relevant to this issue, the court determines that Towers reasonably relied on Blake's apparent authority. "So long as a principal's words and conduct make it reasonable to believe that an agent has authority to enter into a transaction, a third party relying on that reasonable belief need not inquire further into actual authority, and the principal will be bound by its agent". *King World Prod*, 660 F.Supp. at 1385; *Hallock v. State*, 64 N.Y.2d 224, 231,

485 N.Y.S.2d 510, 513, 474 N.E.2d 1178, 1181 (1984).

■ Lastly, even if the court were to accept BWIA's argument that Blake did not have actual or apparent authority, BWIA would still be bound by the extension under the doctrine of ratification. "Ratification is the express or implied adoption of acts of another by one for whom the other assumes to be acting but without authority." *Prisco v. State of New York*, 804 F.Supp. 518, 523 (S.D.N.Y.1992). Consequently, ratification can occur through the silence of the principal. "When an act is done without authority, under an assumed agency, it is the duty of the principal to disavow and repudiate it in a reasonable time after information of the transaction if he would avoid responsibility thereof." *Merex A.G. v. Fairchid Weston Systems Inc.*, 810 F.Supp. 1356, 1370 (S.D.N.Y.1989), *quoting*, 2 N.Y.Jur.2d Agency § 175 at 599 (1979). The court finds that even if BWIA were correct regarding its lack of authority claims, the evidence overwhelmingly demonstrates that BWIA ratified the lease extension, thereby making it enforceable.

The facts and circumstances demonstrate that for six years BWIA agreed and abided by the lease extension. BWIA had never raised a claim, nor even suggested, that the extension was improperly entered into. Month after month, BWIA paid the rent due pursuant to the extension without complaint (R. 107–111). Indeed, that amount aggregated one million dollars. It is impossible that BWIA was not aware that it unnecessarily paid Towers more than one million dollars. Moreover, BWIA directed its employees to negotiate with Towers regarding lower rents and the cost to extricate itself from the lease. Cook's entire testimony related to a perceived agreement between BWIA and Towers as to an amount that would free Towers from the lease. Obviously, if BWIA did not accept the lease extension as binding upon itself, it would not have felt the need to negotiate with Towers to be released. Further demonstrating the binding nature of the lease extension, in May 1990, BWIA provided a "Tenant's Estoppel Certificate", stating that the Lease Extension was "in full force

and effect" and "binding and enforceable ... in accordance with its terms" (Exh. 21). Predicated on this evidence, even if the court were to accept BWIA's claims regarding Blake's authorization, BWIA would still be bound to the lease extension since it was expressly ratified.

In conclusion, then, regarding the lease extension, the evidence demonstrates beyond peradventure of doubt that Blake had actual or implied authority from BWIA to enter into the lease extension on its behalf. Moreover, even if the authority were lacking, Towers reasonably relied on Blake's apparent authority to execute the lease extension. Finally, BWIA's actions subsequent to the lease extension demonstrate that it ratified the actions of Blake. In any event, the court finds that the lease extension is fully binding. on BWIA.

### B.

BWIA next argues that when the locks were changed on the offices by Towers, such action constituted an eviction and therefore, BWIA was not required to pay rent. In support of this argument, BWIA asserts that New York law provides that the changing of the locks, as a matter of law, constitutes a constructive eviction. There is no dispute that on October 23, 1992 Towers had the locks changed on all but the back door of the offices. From this action, BWIA concludes that it was evicted and is not liable for any rent from that date. The court disagrees, and finds that BWIA was not evicted.

■■■ Under New York law "to be an eviction, constructive or actual, there must be a wrongful act by the landlord which deprives the tenant of the beneficial enjoyment or actual possession of the demised premises". *Barash v. Pennsylvania Terminal Real Estate Corporation,* 26 N.Y.2d 77, 81, 308 N.Y.S.2d 649, 653, 256 N.E.2d 707 (1970); *Silver v. Moe's Pizza, Inc.,* 121 A.D.2d 376, 377, 503 N.Y.S.2d 86, 88 (2d Dept.1986) (eviction occurs "where the landlord's wrongful acts substantially and materially deprive the tenant of the beneficial use and enjoyment of the premises"). There is no question that if the landlords' actions do in fact constitute an eviction, the evicted tenant is no longer responsible for payment of rent from the time of the eviction.

■■■ BWIA contends that the mere act of changing the locks creates an eviction. In support of this argument, it relies on the statement by the Court of Appeals that "where the landlord changes the lock, or padlocks the door, there is an actual eviction." *Barash,* 26 N.Y.2d at 83, 308 N.Y.S.2d at 653, 256 N.E.2d at 710. After careful review of New York case law in this area, the court rejects defendant's statement of the law and finds that in order for any action, including the changing of locks on a premise, to constitute an eviction there must be intent on the part of the landlord to keep the tenant out by reason of that action.

■■■ The notion that merely changing the locks constitutes an eviction has been expressly rejected by the New York courts. *Equitable Tower Assoc. v. El Paso Natural Gas,* 134 Misc.2d 23, 24, 511 N.Y.S.2d 197, 198 (App. Term 1st Dept.1986) (holding that changing of locks did not constitute an eviction when tenant had moved out of the premises and landlord changed locks in order to conform the locks to a master key); *Breezy Point Cooperative v. Rockaway Point Drug Store, Inc.,* N.Y.L.J., April 17, 1977, p. 13 (Civ.Ct.Queens Co.1977) (locks changed by landlord to preserve the premises could not be construed as an eviction). Indeed, in *Breezy Point,* the court explained why such a bright-line rule should be rejected:

> With reference to the padlocking or lock changing, tenant contends that act, by itself constitutes an unlawful eviction ... [citations omitted] on the contrary, the court's reading of the padlock cases reveal one common thread running throughout. That is the required preliminary factual determination referable to the intent of the party or parties installing the padlock. If the intent was to forcibly restrain the tenant from re-entering the premises, the action was unlawful and constituted an eviction. [citations omitted] In the within case, based upon the credible testimony, the court finds that the landlord's intent was to preserve the premises from further waste, not to evict the tenant. According-

ly, the landlord's actions did not constitute an eviction.

*Breezy Point,* N.Y.L.J., at 13. The court agrees with this analysis. Close scrutiny of New York cases involving the changing of locks by landlords reveals that when courts found the actions constituted an eviction, there was a clear manifested intent on the part of the landlord to bar the tenant from entry. *See e.g., 3855 Broadway Laundromat Inc. v. 600 West 161st Street Corp et. al.,* 156 A.D.2d 202, 548 N.Y.S.2d 461 (1st Dept.1989) (fact that defendant "committed acts, such as changing locks on the premises and *otherwise preventing* plaintiff access thereto" constituted eviction) (emphasis added); *Sam & Mary Housing Corp v. Jo/Sal Market,* 121 Misc.2d 434, 468 N.Y.S.2d 294 (Sup.Ct.1983), *mod. on other grounds,* 100 A.D.2d 901, 474 N.Y.S.2d 786 (2d Dept.1984) (padlocking door and having former tenant chased out of premises by police constituted an eviction); *Yates v. Kaplan,* 75 Misc.2d 259, 347 N.Y.S.2d 543 (Civil Ct.N.Y.County 1973) (other tenants who acting on behalf of the landlord padlocked the tenant's door because "they decided they no longer wished Mrs. Yates" to live in the apartment evicted her under the law); *Kobouroff v. Blake,* 16 Misc.2d 202, 183 N.Y.S.2d 934 (Municipal Ct.1959) (landlord who believed tenant was a prostitute and wanted her out of the building padlocked the apartment constituting an eviction). In sum, changing the locks can and often does constitute an eviction, but, there must also be an intent on the part of the landlord to keep the tenant out.

In addition to the New York case law which supports this court's findings, such an interpretation is the only reasonable construction of New York law. Certainly if a landlord had a bona fide reason to change locks, a reason that had nothing to do with keeping the tenant out of the premises, it would be illogical to consider the action an eviction. Accordingly, the issue turns on the *intent* of Towers when it changed the lock.

By October 10, 1992, all of the BWIA personnel had left the office, the furniture had been removed, and the phone had been disconnected. In addition, no keys were returned to Towers. All of these ac-

tions were undertaken voluntarily by BWIA. Moreover, BWIA had notified Towers as early as July that it would vacate the premises. Only after each of these actions by BWIA, some weeks later, were the locks changed at the direction of Busch because of safety concerns. For the following reasons the court credits Towers' claim that it changed the lock only for safety reasons and had no intention of keeping BWIA out of the building.

The uncontroverted evidence shows that this building is located in a very public area. Because several years earlier there was an incident in this very building where a tenant had vacated its office and since it was not secured, a woman was accosted and raped in the vacant office. Inasmuch as the location of the building, its very public access, and the undisputed testimony regarding the prior rape, the action of changing the locks after BWIA had all but abandoned the premises was entirely reasonable.

Nor is there any indication that Towers sought to keep BWIA out of the building. Initially, Towers had endeavored to get BWIA to change its plans about leaving the premises. Towers consistently sent letters to BWIA stating that the lease was still in effect and continued to bill BWIA for rent due. These actions are not indicative of an attempt to keep BWIA out. Moreover, the rear door lock was not changed. BWIA could still gain entrance to its old offices through that door. Certainly, leaving the back door lock unchanged is not consistent with the theory that Towers wanted to shut BWIA out of the offices. Towers even made copies of the key available for representatives of BWIA to utilize at any time. Regarding access to the offices, the attorneys for BWIA and Towers stipulated that if BWIA:

> had wanted to go in and called Mr. Korotkin, he would make arrangements to assist BWIA or any representative of BWIA to get into the premises that Mr. Korotkin would have done that. I will stipulate.

(R. 302). As discussed previously, the court credits the testimony of Getchell that a new key was picked up by a BWIA employee.

■ Although the court believes the testimony of Baldeo regarding her visit to the office, it is of little significance. First, it is important to note that the locks were changed on October 23, 1992 and it was not until February 23, 1993, *four months later,* that BWIA even was aware the locks had been changed. Importantly too, it was after the lawsuit had been commenced that BWIA ever tried to regain entry by virtue of Baldeo. Based on the timing of Baldeo's visit, the fact that BWIA had relocated to Florida, and that there was no attempt to ever contact anyone at Towers who held a position higher than superintendent, the court is suspect of the BWIA's motivations for sending Baldeo to their former offices. Although it is clear that she acted in good faith, the court suspects that there was no legitimate interest on the part of BWIA to regain access and control of the premises. Moreover, even if it was a bona fide effort, that does not change the court's conclusion that the lock change were a legitimate security purpose with no intent on the part of Towers to keep BWIA out of the premises.

Essentially, it appears that New York courts have explicitly rejected the notion that the simple act of changing the lock, absent a showing that the landlord intended to keep the former tenant out, constitutes an eviction. The court declines BWIA's invitation to create such a bright-line rule since it would create illogical results and run contrary to the law espoused by the New York courts. The evidence adduced at trial clearly demonstrates that Towers' actions were designed only to secure the offices and that it in no way intended to keep BWIA out. BWIA's move of people, furniture, and disconnecting of the phone lines indicated that it abandoned the premises. Until the current lawsuit was actually filed, there was no action by BWIA to indicate that it ever sought to re-enter the premises or even knew the locks were changed. Lastly, BWIA stipulated that Towers would provide access whenever BWIA desired. For these reasons, the court rejects BWIA's claim that it was evicted.

### C.

Having found that BWIA unjustifiably "broke the lease", the only issue left is resolution of damages. Towers maintains that it is entitled to all of the back rent, up until July 1995 when it obtained a new tenant. In addition, Towers seeks reimbursement for necessary improvements required to attract the new tenant. Further, pursuant to the provisions of the original lease, Towers seeks legal fees. BWIA, which had sought its own legal fees in the event that it was successful, opposes Towers' claim of legal fees.

■ There is no disagreement regarding Towers' first two claims. It is undisputed that BWIA has failed to pay any rent to Towers since October 1992. BWIA does not contest that the amount of rent due owing from October 31, 1992 until June 30, 1995 is $839,226.77 (R. 109, Exh. 54–81, 116, 119–126, 131–34). Consequently, BWIA is liable to Towers for back rent in the amount of $839,-226.77. Further undisputed by BWIA is Towers' claim that BWIA must reimburse it for improvements made on the offices in order to attract new tenants. The lease specifically provided that:

> there shall be added to the said deficiency such expenses as Landlord may incur in connection with the re-letting, such as ... preparing the [demised premises] for re-letting. ... Landlord [may] make such alterations, repairs, replacements, and/or decorations in the demised premises as Landlord, in Landlord's sole judgment, considers advisable and necessary for the purpose of re-letting the demised premises.

(Exh. 3, par. 18). BWIA has raised no challenge to this lease provision, or Towers' claim that it is entitled to reimbursement. Nor is there any argument that Towers' out of pocket cost to alter the space for the new tenants was $147,439.73 (R. 65–68; Exh. 53). Therefore, BWIA is additionally liable to Towers for reimbursement costs in the amount of $147,439.73.

Towers finally contends that it is entitled to attorney's fees as provided for by the lease. While BWIA does not dispute the validity of the lease provision providing for attorneys' fees, it does claim that Towers'

demand is unreasonable in three ways [3]. First, BWIA argues that this action could have been brought in New York landlord-tenant court for much less expenditure. Second, it claims that Towers' motion for summary judgment "was only a strategic device to flesh out the defenses to the complaint and ought not have been made in the first place" (defendant's post-trial memorandum, p. 49). Third, BWIA attacks the specific billings of $1,870 for keeping the attorneys' file organized between December 7, 1994 and December 29, 1994, as well as the bill of $550 between August 3, 1993 and August 18, 1993 for the purpose of organizing the attorneys' file, as unreasonable. The court will address each claim in turn.

 Under New York law, attorney fees are ordinarily considered to be incident to litigation and are not recoverable unless specifically permitted by statute or authorized by agreement between the parties. *Hooper Associates v. AGS Computers,* 74 N.Y.2d 487, 491, 549 N.Y.S.2d 365, 366, 548 N.E.2d 903, 904 (1989); *AG Ship Maintenance Corp. v. Lezak,* 69 N.Y.2d 1, 5, 511 N.Y.S.2d 216, 218, 503 N.E.2d 681 (1989). The lease, in this instance, is clear:

> If the tenant shall default [Landlord is entitled to its] attorney's fees, in instituting, prosecution or defending any action or proceeding.

(Exh. 3, par. 19). Since the lease expressly authorizes an award of attorney fees, and BWIA does not challenge the specific lease provision, attorney fees may be awarded.

 BWIA initially maintains that the fees are unreasonable because the case could have been brought in state court which BWIA asserts would have been less expensive. The court holds this argument to be without merit. Towers, as was its right, chose to bring this case in federal court. BWIA does not really explain how the state forum would have been less expensive. The same arguments would have been made,

Towers would have required the same discovery, and Towers would still have had to defend against each of BWIA's claims. Considering that state court dockets are certainly as congested as those of the federal courts, there is no reason to believe that this case would have proceeded any more expediently. More, this case became complicated as BWIA raised many complex defenses requiring extensive research and analysis. Each of these factors would be the same whether in state or federal court. Indeed, a recent New York State case demonstrates the fallacy of the claim that a state court proceeding would necessarily have been less costly. The New York State Supreme Court, Appellate Division, First Department affirmed a $470,000 counsel fee award in a landlord tenant case, an amount nearly double Towers' claim. *Kumble v. Windsor Plaza Co.,* 161 A.D.2d 259, 259–60, 555 N.Y.S.2d 290, 291 (1st Dept. 1990). Simply put, BWIA's bald assertion that state court litigation would have been less expensive is unpersuasive.

Towers contends its total legal fees amounted to $289,896.28. It points out that the cost was high because of the vigorous opposition by BWIA to pay the rent, the services of BWIA's able attorneys who "took every measure and exerted every effort on behalf of their client", and the necessity of Towers to conduct extensive discovery and respond to each and every defense (Plaintiff's Post–Trial Brief, p. 6). Towers also submitted numerous documents which detailed its billings (Exh. 53, 82–85, 100–115, 117–118, 128–130, 137–140). Out of this figure, BWIA specifically challenges $10,000 for Towers' motion for summary judgement and $2420 for record keeping. Thus, the total amount for which BWIA launches a specific challenge is $12,420.

 Regarding the unchallenged $277,476.28, the court finds these fees to be reasonable. It must be pointed out that there was no specific challenge to this amount. There is no requirement for a court

---

**3.** BWIA suggests that because Towers has not yet fully paid the bill, this court should not award more money than what Towers had actually paid. The court denies this notion. If it is found that the amount billed is reasonable and in good faith, it is of no moment that Towers may have fallen behind in payment. The test is whether the billings are reasonable, not whether the client's balance is up to date. BWIA presents no legal authority, nor can the court find any, which supports BWIA's claim.

to review extensive proof which is credible on its face regarding attorney fees when no specific challenge is presented to the defense. *Kumble*, 555 N.Y.S.2d at 291. Moreover, when the "fees and costs were set forth with great specificity and were uncontroverted, they are deemed to be admitted." *Simithis v. 4 Keys Leasing & Maintenance*, 151 A.D.2d 339, 342, 542 N.Y.S.2d 595, 598 (1st Dept.1989). Hence, the court is empowered to simply award the undisputed amount to Towers. In this case, however, the court nonetheless conducted its own review of the billing documents and after considering material factors such as "the time spent, the difficulties involved in the matters in which the services were rendered, the nature of the services, the amount involved, the professional standing of counsel, and the results obtained", the court finds that the uncontroverted amount of $277,476.28 to be reasonable. *Matter of the Estate of Potts*, 213 A.D. 59, 209 N.Y.S. 655 (4th Dept.), *aff'd*, 241 N.Y. 593, 150 N.E. 568 (1925); *Matter of Bobeck*, 196 A.D.2d 496, 497, 600 N.Y.S.2d 758, 759 (2d Dept.1993).

■ Turning to the specific challenges made by BWIA, the court rejects its argument that the $10,000 cost for the summary judgment motion is unreasonable. In an effort to bring the litigation to an early end, Towers moved for summary judgment. While it is true that the motion was denied, it cannot be said that the motion was made in bad faith. BWIA insists that because there were issues of fact to be resolved, Towers should have known that it would lose the motion. Taken to its logical conclusion, BWIA's argument suggests that any motion for summary judgment, which is denied, would have been made in bad faith because it could always be claimed, after the fact, that the attorney should have known there would be disputes of fact. Plaintiff's attempt to shorten litigation and obtain a judgment in its favor is what one would anticipate from diligent lawyering. Towers' attorneys had

an obligation to attempt to win its claim without proceeding to trial. Accordingly, the court does not find the billing for the summary judgment motion to be unreasonable.

■ Lastly, BWIA states that the $2420 cost to keep the file in order for approximately 24 hours work was unreasonable. The court disagrees. This was a complex case with literally thousands of pages of documents. In many respects the documents were vital to address many of the claims put forward by each side. Obviously, when documents are important to a case, it is imperative that they be maintained orderly, and that the trial attorney has easy access to any document which may be immediately needed for trial or motion. Therefore, in a such a case, it is not unreasonable that attorneys and clerical help were assigned to maintain and index the files. BWIA offers no alternative explanation as to how the files should have been maintained, nor does it explain why the cost is unreasonable. Essentially, then, BWIA's argument boils down to its assertion that the cost was unreasonable for no other reason other than BWIA says so. If a court decides to eliminate hours of service that are adequately documented by the attorneys, a clear basis for that decision must be articulated. *Kumble*, 555 N.Y.S.2d at 291. BWIA offers no reasons why the amount is excessive, and predicated upon its own examination, the court finds the billing regarding file maintenance to be reasonable. Hence, BWIA is liable for $839,226.77 for arrears rent, $147,439.73 for renovation costs, and $289,896.28 for attorney fees [4], all totaling $1,276,562.78.

## CONCLUSION

With regard to Towers' claim, the court determines that BWIA was bound by the lease extension; that the extension was valid; and that BWIA was not evicted by Towers. Accordingly, BWIA wrongfully breached the leasehold agreement. Towers shall recover

---

4. The court must emphasize that of the $289,896.28 claimed by Towers for legal fees, only $12,420 was specifically challenged by BWIA. Applying New York law, when a party fails to controvert fees and costs set forth with specificity, that party will be deemed to have admitted

the costs. *Kumble v. Windsor Plaza Co.*, 161 A.D.2d 259, 259–260, 555 N.Y.S.2d 290, 291 (1st Dept.1990); *Simithis v. 4 Key Leasing & Maintenance*, 151 A.D.2d 339, 342, 542 N.Y.S.2d 595, 598 (1st Dept.1989).

$839,226.77 for back rent, $147,439.73 for renovation costs, and $289,896.28 for attorney fees, all totaling $1,276,562.78.

The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**